## BROWN *v.* ALLEN, WARDEN.

NO. 32.

Argued April 29, 1952.—Reargued October 13, 1952.—Decided February 9, 1953.

444

*Hosea V. Price* argued the cause for petitioner in No. 32. *Herman L. Taylor* filed a brief for petitioner.

*Herman L. Taylor* argued the cause and filed a brief for petitioner in No. 22.

*O. John Rogge* and *Murray A. Gordon* argued the cause for petitioners in No. 20. *Mr. Taylor* was with them on the brief.

*R. Brookes Peters* argued the cause for respondent in No. 32. *E. O. Brogden, Jr.* argued the cause for respondent in No. 22. *Ralph Moody,* Assistant Attorney General of North Carolina, argued the cause for respondent in No. 20. With them on the briefs was *Harry McMullan,* Attorney General.

MR. JUSTICE REED delivered the opinion of the Court.

Certiorari was granted to review judgments of the United States Court of Appeals for the Fourth Circuit. 343 U. S. 903; 342 U. S. 953; 342 U. S. 941. These cases

were argued last year. As the records raised serious federal constitutional questions upon which the carrying out of death sentences depended and procedural issues of importance in the relations between states and the Federal Government upon which there was disagreement in this Court, we decided to set the cases for reargument. We have now heard the cases again.

The judgments of affirmance were entered October 12, 1951, on appeal from three judgments of the United States District Court for the Eastern District of North Carolina, refusing writs of habeas corpus sought by prisoners convicted in that state. We conclude that all required procedure for state review of the convictions had been exhausted by petitioners in each case before they sought the writs of habeas corpus in the federal courts. In each case petitions for certiorari to this Court for direct review of the state judgments rendered by the highest court of the state in the face of the same federal issues now presented by habeas corpus had been denied.[1]

It is not necessary in such circumstances for the prisoner to ask the state for collateral relief, based on the same evidence and issues already decided by direct review with another petition for certiorari directed to this Court.[2] It is to be noted that an applicant is barred unless he has "exhausted the remedies available in the courts of the State . . . by any available procedure." The legislative history shows that this paragraph, *in haec verba,* was presented to the Congress with the recommendation of

---

[1] *Brown* v. *North Carolina,* 341 U. S. 943; *Speller* v. *North Carolina,* 340 U. S. 835; *Daniels* v. *North Carolina,* 339 U. S. 954.

[2] We reach this conclusion after consideration of the second paragraph of 28 U. S. C. § 2254:

"An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented."

the Judicial Conference. The legislative history of 28 U. S. C. § 2254 has no discussion of the considerations which moved congressional enactment other than that contained in S. Rep. No. 1559. But see a similar clause § 2254 in H. R. 3214, 80th Cong., 1st Sess.; H. R. 3214, 80th Cong., 2d Sess.; S. Rep. No. 1559, 80th Cong., 2d Sess., p. 9; Report of the Judicial Conference of Senior Circuit Judges, 1947, pp. 17–20.

The second paragraph of § 2254 has been construed by several courts of appeals. In *Ekberg* v. *McGee,* 191 F. 2d 625, the Ninth Circuit refused to consider that the statute meant to deny a federal forum where state procedures were inexhaustible. The Third Circuit in *Master* v. *Baldi,* 198 F. 2d 113, 116, held that the exhaustion of one of several available alternative state remedies with this Court's denial of certiorari therefrom is all that is necessary. In *Bacom* v. *Sullivan,* 181 F. 2d 177, and *Bacom* v. *Sullivan,* 194 F. 2d 166, the Fifth Circuit ruled that when a federal question had been presented to the state courts by at least one post-conviction procedure, certiorari on the same question having been once denied by this Court, there appeared a unique and extraordinary circumstance justifying federal examination under *Darr* v. *Burford,* 339 U. S. 200.[3]

---

[3] Outside the cases, it has been strongly urged that the purpose of subparagraph 2 was to eliminate the right of a federal district court to entertain an application so long as any state remedy remained available. In an article by Chief Judge Parker, Chairman of the Judicial Conference Committee which drafted the new Habeas Corpus Act, *Limiting the Abuse of Habeas Corpus,* 8 F. R. D. 171, 176 (1949), this construction of § 2254 is presented:

"The effect of this last provision is to eliminate, for all practical purposes, the right to apply to the lower federal courts for habeas corpus in all states in which successive applications may be made for habeas corpus to the state courts; for, in all such states, the applicant has the right, notwithstanding the denial of prior applications, to apply again to the state courts for habeas corpus and to

When, in April 1948, Judge Maris presented the Judicial Conference draft of § 2254 to the Senate Judiciary Subcommittee, the language of the revision of 28 U. S. C., on which the hearings were being held, set out three bases for exercise of federal jurisdiction over applications for habeas corpus from state prisoners. Under the language of the bill as it then read, an application might have been entertained where it appeared (1) that the applicant had exhausted the remedies available in the courts of the state, or (2) where there was no adequate remedy available in such courts, or (3) where such courts had denied the applicant a fair adjudication of the legality of his detention under the Constitution and laws of the United States. In accepting the recommendation of the Judicial Conference, the Congress eliminated the third basis of jurisdiction. S. Rep. No. 1559, p. 9, shows the reason for this as follows:

"The second purpose is to eliminate, as a ground of Federal jurisdiction to review by habeas corpus judgments of State courts, the proposition that the State court has denied a prisoner a 'fair adjudication of the legality of his detention under the Constitution and laws of the United States.' The Judicial Conference believes that this would be an unde-

---

have action upon such later application reviewed by the Supreme Court of the United States on application for certiorari."

We do not so construe § 2254. We do not believe Congress intended to require repetitious applications to state courts. § 2254 originally read as follows:

"An application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court or authority of a State officer shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the State, or that there is no adequate remedy available in such courts or that such courts have denied him a fair adjudication of the legality of his detention under the Constitution and laws of the United States."

§ 2254 of H. R. 3214, 80th Cong., 2d Sess.

sirable ground for Federal jurisdiction in addition to exhaustion of State remedies or lack of adequate remedy in the State courts because it would permit proceedings in the Federal court on this ground before the petitioner had exhausted his State remedies. This ground would, of course, always be open to a petitioner to assert in the Federal court after he had exhausted his State remedies or if he had no adequate State remedy.

"The third purpose is to substitute detailed and specific language for the phrase 'no adequate remedy available.' That phrase is not sufficiently specific and precise, and its meaning should, therefore, be spelled out in more detail in the section as is done by the amendment."

If the substitution for "adequate remedy available" of the present definition was intended by the Congress to eliminate the right of a state prisoner to apply for relief by habeas corpus to the lower federal courts, we do not think that the report would have suggested that a remedy for denial of a "fair adjudication" was in the federal court. The suggested elimination of district and circuit courts does not square with the other statutory habeas corpus provisions. See 28 U. S. C. §§ 2241, 2242, 2251, 2252, 2253, 3d paragraph. We are unwilling to conclude without a definite congressional direction that so radical a change was intended.

In each of these cases the District Court, in determining the propriety of its granting the writ, considered the effect of our refusal of certiorari on the same questions upon direct review of the judgments of the highest court of the state. As that question, pretermitted in our ruling in *Darr* v. *Burford,* 339 U. S. 200, 214–217, a case where no certiorari was sought here from state denial of collateral relief by habeas corpus from imprisonment, had given rise to definite differences of opinion in the federal

courts, a ruling here was necessary.[4] There is a similar difference in this Court.[5] As other issues command a majority that upholds the judgments of the Court of Appeals, this opinion is that of the Court although it represents the minority view on the effect of our denial

---

[4] The courts below have divided since the *Darr* case on the effect to be accorded a denial of certiorari by this Court.

NO SUBSTANTIVE EFFECT

*Goodman* v. *Lainson,* 182 F. 2d 814.

*McGarty* v. *O'Brien,* 188 F. 2d 151.

*Soulia* v. *O'Brien,* 188 F. 2d 233.

*Odell* v. *Hudspeth,* 189 F. 2d 300.

*Ekberg* v. *McGee,* 191 F. 2d 625 (also reported at 194 F. 2d 178).

*Sampsell* v. *California,* 191 F. 2d 721.

*Melanson* v. *O'Brien,* 191 F. 2d 963.

*Bacom* v. *Sullivan,* 194 F. 2d 166.

*Almeida* v. *Baldi,* 195 F. 2d 815.

*Hawk* v. *Hann,* 103 F. Supp. 138.

*Ex parte Wells,* 99 F. Supp. 320.

*Fouquette* v. *Bernard,* 198 F. 2d 96.

*Master* v. *Baldi,* 198 F. 2d 113.

*Daverse* v. *Hohn,* 198 F. 2d 934.

DISCRETIONARY EFFECT

*Anderson* v. *Eidson,* 191 F. 2d 989.

*Holland* v. *Eidson,* 90 F. Supp. 314.

*Pennsylvania ex rel. Gibbs* v. *Ashe,* 93 F. Supp. 542.

*Soulia* v. *O'Brien,* 94 F. Supp. 764.

*McGarty* v. *O'Brien,* 96 F. Supp. 704.

*Goodwin* v. *Smyth,* 181 F. 2d 498.

*Adkins* v. *Smyth,* 188 F. 2d 452.

*Byars* v. *Swenson,* 192 F. 2d 739.

*Frazier* v. *Ellis,* 196 F. 2d 231.

*Lyle* v. *Eidson,* 197 F. 2d 327.

*Skinner* v. *Robinson,* 105 F. Supp. 153.

[5] The participation of a district court through habeas corpus proceedings in determining whether state prisoners have been granted a fair trial is a sensitive area in our federated system. *Speller* v. *Crawford,* 99 F. Supp. 92, 96; *Smith* v. *Baldi,* 192 F. 2d 540, 543.

In September 1952, at its fourth annual meeting, the Conference of Chief Justices adopted a resolution questioning the habeas corpus principles "enunciated in certain recent federal decisions." The resolution expressed the consensus of the Chief Justices that "a final judgment of a State's highest court [should] be subject to review or reversal only by the Supreme Court of the United States." Concern was noted that the hearing of the successive petitions by federal

of certiorari. The position of the majority upon that point is expressed by the opinion of MR. JUSTICE FRANKFURTER, *post,* p. 488. A summary review of habeas corpus practice in the federal courts in relation to state criminal convictions will be found in *Hawk* v. *Olson,* 326 U. S. 271, 274, and *Darr* v. *Burford,* 339 U. S. 200, 203. It is hoped the conclusions reached herein will result in the improvement of the administration of justice and leave the indispensable function of the Great Writ unimpaired in usefulness.

## II. Effect of Former Proceedings.

The effect to be given this Court's former refusal of certiorari in these cases was presented to the District Court which heard the applications for federal habeas corpus upon full records of the state proceedings in the trial and appellate courts. In No. 32, *Brown* v. *Allen,* the District Court, upon examination of the application, the answer, and the exhibits, adopted, without hearing argument or testimony, the findings of the sentencing judge with respect to both the composition of the grand jury and the voluntary character of the confession. These were the federal constitutional issues involved in the state trial. The record which the District Judge had before him embraced the record of the case in the North Carolina courts and this Court, including all the relevant portions of the transcript of proceedings in the sentencing court. The District Court then dismissed the petition. *Sub nom. Brown* v. *Crawford,* 98 F. Supp. 866.

In No. 22, *Speller* v. *Allen,* the petition for habeas corpus in the District Court raised again the same federal question which had been passed upon by the trial and ap-

district courts would tend toward a dilution of the sense of judicial responsibility, a delay in the enforcement of criminal justice, and an impairment of confidence in state judicial institutions. 25 State Government, pp. 249–250.

pellate courts in North Carolina and which had been offered to this Court on petition for certiorari; to wit, the jury commissioners had "pursuant to a long and continuous practice, discriminated against Negroes in the selection of juries, solely on account of race and/or color." The District Court had before it the record which had been filed in the Supreme Court of North Carolina on appeal. Included in this record was the same transcript of proceedings in the trial court which had been before the State Supreme Court. In addition, the District Court took further evidence by way of testimony and stipulation. The District Court, upon examination of all the evidence and the stipulations, adopted the findings of the sentencing judge with respect to the composition of the trial jury. It added that petitioner "failed to substantiate the charge that he did not have a trial according to due process, . . . ." The court then vacated the writ; and held that while the petition could be dismissed "solely in the light of the procedural history," there was the added alternative ground of failure to substantiate the charge. *Sub nom. Speller* v. *Crawford,* 99 F. Supp. 92, 97.

In No. 20, *Daniels* v. *Allen,* petitioners at the state trial made a timely motion to quash the indictment and challenged the array, alleging discrimination against Negroes in the selection of both grand and petit jurors in contravention of the guarantees of the Fourteenth Amendment. Timely objection was also made to admission in evidence of what were alleged to be coerced confessions. Petitioners contend that the admission of these confessions violated their due process rights under the Fourteenth Amendment. They also urge that the refusal of the Supreme Court of North Carolina to examine the merits of the trial record in the state courts because of their failure to serve a statement of the case on appeal until one day beyond the period of limitation, is a denial of equal protection under the Fourteenth Amendment. In their

application to the District Court, petitioners repeated once again those federal constitutional questions which had earlier been presented to the sentencing court and the Supreme Court of North Carolina and which had also been repeated in their petition for certiorari filed in this Court.

In examining the application, the District Court Judge studied the records of the trial and appellate courts of North Carolina, including a transcript of the proceedings in the sentencing court. He concluded that the findings of the judge of the sentencing court on the matter of whether the jury had been properly selected were supported by all the evidence and that it was not shown that there was a purposeful and systematic exclusion of Negroes solely on account of race. He also found that the trial judge correctly determined that the confessions were voluntary and that the instruction concerning the confessions was adequate. In addition the District Judge heard all evidence offered by the prosecution or defense.

The District Court Judge did advert to the circumstance that this Court had denied a petition for certiorari on the same questions, and he further observed that to his mind the procedural history of the case did not make it appear that petitioners were denied the substance of a fair trial. He added that petitioners "failed to substantiate the charges made." 99 F. Supp. at 216. The writ was vacated and the application dismissed. On the procedural history, the District Court refused to entertain the request. *Sub nom. Daniels* v. *Crawford,* 99 F. Supp. 208.

The records of the former proceedings thus determined the action of the United States District Court. The fact that further evidence was heard in two of the cases was to assure the judge that the prisoners were not held in custody in violation of the Constitution. In dismissing these petitions for habeas corpus the District Court did not treat our denial of certiorari as conclusive.

In the *Brown* case, the last one decided, Judge Gilliam based his decision on this finding of fact:

"12. The facts found by the trial Judge, in respect to the composition of the grand jury, are supported by the evidence before him, and these findings and the conclusion thereon are adopted as findings in this respect, and the facts found by that Court in respect to the question of admission of statements made by the defendant are also supported by the evidence, and these findings and the conclusions thereon are likewise adopted." 98 F. Supp. 866, 870.

The court cited from *Stonebreaker* v. *Smyth,* 163 F. 2d 498, 499, in support of the above statement that this is the proper rule:

" 'While action of the Virginia courts and the denial of certiorari by the Supreme Court were not binding on the principle of res judicata, they were matters entitled to respectful consideration by the court below; and in the absence of some most unusual situation, they were sufficient reason for that court to deny a further writ of habeas corpus.' " 98 F. Supp. at 868.

In the *Speller* case, the pith of his conclusion is stated as follows:

" 'The Court now concludes that the writ should be vacated and the petition dismissed upon the procedural history and the record in the State Courts, for the reason that habeas corpus proceeding is not available to the petitioner for the purpose of raising the identical question passed upon in those Courts.' " 99 F. Supp. 92, 95.

To this was added the alternative ground of agreement with the conclusions of the sentencing court. See pp. 452–453, *supra.*

In the *Daniels* case, decided the same day, the District Court left open the question of its power to reexamine, 99 F. Supp. at 213, and concluded on the record that the State had afforded a fair trial.

A. *Effect of Denial of Certiorari.*—In cases such as these, a minority of this Court is of the opinion that there is no reason why a district court should not give consideration to the record of the prior certiorari in this Court and such weight to our denial as the District Court feels the record justifies. This is the view of the Court of Appeals. 192 F. 2d 763, 768 *et seq.; Speller* v. *Allen,* 192 F. 2d 477. This is, we think, the teaching of *Ex parte Hawk,* 321 U. S. 114, 118, and *White* v. *Ragen,* 324 U. S. 760, 764, 765. We have frequently said that the denial of certiorari "imports no expression of opinion upon the merits of a case." *House* v. *Mayo,* 324 U. S. 42, 48; *Hamilton-Brown Shoe Co.* v. *Wolf Bros. & Co.,* 240 U. S. 251, 258. Cf. *Ex parte Abernathy,* 320 U. S. 219. When on review of proceedings no *res judicata* or precedential effect follows, the result would be in accord with that expression, that statement is satisfied. But denial of certiorari marks final action on state criminal proceedings. In fields other than habeas corpus with its unique opportunity for repetitious litigation, as demonstrated in *Dorsey* v. *Gill,* 80 U. S. App. D. C. 9, 148 F. 2d 857, see 7 F. R. D. 313, the denial would make the issues *res judicata.* The minority thinks that where a record distinctly presenting a substantial federal constitutional question disentangled from problems of procedure is brought here by certiorari and denied, courts dealing with the petitioner's future applications for habeas corpus on the same issues presented in earlier applications for writs of certiorari to this Court, should have the power to take the denial into consideration in determining their action. We indicated as much in *House* v. *Mayo, supra,* p. 48, and *Ex parte Hawk, supra,*

p. 117, when we specifically approved a district court's refusal to reexamine ordinarily the questions passed upon by our denial. Permitting a district court to dismiss an application for habeas corpus on the strength of the prior record should be a procedural development to reduce abuse of the right to repeated hearings such as were permitted during the period when there was no review of the refusal of a habeas corpus application, *Salinger* v. *Loisel,* 265 U. S. 224. See 61 Harv. L. Rev. 657, 670. Compare the protection given by statute against abuse of habeas corpus in federal criminal proceedings, 28 U. S. C. § 2244. Since a federal district court has power to intervene, there is a guard against injustice through error. *Darr* v. *Burford, supra,* at 214. It should be noted that the minority does not urge that the denial of certiorari here is *res judicata* of the issues presented. It is true, as is pointed out in the opinion of MR. JUSTICE FRANKFURTER, the records of applications for certiorari to review state criminal convictions, directly or collaterally, through habeas corpus or otherwise, are not always clear and full. Some records, however, are. It seems proper for a district court to give to these refusals of certiorari on adequate records the consideration the district court may conclude these refusals merit. This would be a matter of practice to keep pace with the statutory development of 1867 that expanded habeas corpus. We think it inconsistent to allow a district court to dismiss an application on its appraisal of the state trial record, as we understand those do who oppose our suggestion (see MR. JUSTICE FRANKFURTER's opinion, *post,* pp. 500–501 and 503–506), but to refuse to permit the district court to consider relevant our denial of certiorari.

B. *Effect of State Court Adjudications.*—With the above statement of the position of the minority on the weight to be given our denial of certiorari, we turn to another question. The fact that no weight is to be given

by the Federal District Court to our denial of certiorari should not be taken as an indication that similar treatment is to be accorded to the orders of the state courts. So far as weight to be given the proceedings in the courts of the state is concerned, a United States district court, with its familiarity with state practice is in a favorable position to recognize adequate state grounds in denials of relief by state courts without opinion. *A fortiori,* where the state action was based on an adequate state ground, no further examination is required, unless no state remedy for the deprivation of federal constitutional rights ever existed. *Mooney* v. *Holohan,* 294 U. S. 103; *Ex parte Hawk,* 321 U. S. 114. Furthermore, where there is material conflict of fact in the transcripts of evidence as to deprivation of constitutional rights, the District Court may properly depend upon the state's resolution of the issue. *Malinski* v. *New York,* 324 U. S. 401, 404. In other circumstances the state adjudication carries the weight that federal practice gives to the conclusion of a court of last resort of another jurisdiction on federal constitutional issues. It is not *res judicata.*[6]

Furthermore, in view of the consideration that was given by the District Court to our denial of certiorari in these cases, should we return them to that court for reexamination in the light of this Court's ruling upon the effect to be given to the denial? We think not. From the findings of fact and the judgments of the District Court we cannot see that such consideration as was given by that court to our denials of certiorari could have had any effect on its conclusions as to whether the respective defendants had been denied federal constitutional protec-

---

[6] As the burden of overturning the conviction rests on the applicant, he should allege specifically, in cases where material, the uncontradicted evidentiary facts appearing in the record upon which is based his allegation of denial of constitutional rights.

tion.[7]  It is true, under the Court's ruling today, that the District Court in each of the three cases erroneously gave consideration to our denial of certiorari.  It is also true that its rulings, set out above, show that without that consideration, it found from its examination of the state records and new evidence presented that the conduct of the respective state proceedings was in full accord with due process.  Such conclusions make immaterial the fact that the trial court gave consideration to our denial of certiorari.

The District Court and the Court of Appeals recognized the power of the District Court to reexamine federal constitutional issues even after trial and review by a state and refusal of certiorari in this Court.  *Darr* v. *Burford,* 339 U. S., at 214.  The intimation to the contrary in the *Speller* case, 99 F. Supp., at 95, see p. 453, *supra,* must be read as the Court's opinion after the hearing.  "In the review of judicial proceedings the rule is settled that if the decision below is correct, it must be affirmed, although the lower court relied upon a wrong ground or gave a wrong reason." [8]  Certainly the consideration given by the District Court to our former refusals of certiorari on the issues presented cannot affect its determinations that there was no merit in any of the applications for habeas corpus.  98 F. Supp. 868, 870; 99 F. Supp.

---

[7] The applicable Rule 61 of the Fed. Rules Civ. Proc. is as follows:

"No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties."

[8] *Helvering* v. *Gowran,* 302 U. S. 238, 245.  See *Riley Co.* v. *Commissioner,* 311 U. S. 55, 59.

97, 99; 99 F. Supp. at 216. Where it is made to appear affirmatively, as here, that the alleged error could not affect the result, such errors may be disregarded even in the review of criminal trials.[9] Whether we affirm or reverse in these cases, therefore, does not depend upon the trial court's consideration of our denial of certiorari but upon the soundness of its decisions upon the issues of alleged violation of federal procedural requirements or of petitioner's constitutional rights by the North Carolina proceedings. We now take up those problems.

### III. RIGHT TO PLENARY HEARING.

Petitioner alleges a procedural error in No. 32, *Brown* v. *Allen*. As we stated in the preceding subdivision, the writ of habeas corpus was refused on the entire record of the respective state and federal courts. 98 F. Supp. 866. It is petitioner's contention, however, that the District Court committed error when it took no evidence and heard no argument on the federal constitutional issues. He contends he is entitled to a plenary trial of his federal constitutional issues in the District Court. He argues that the Federal District Court, with jurisdiction of the particular habeas corpus, must exercise its judicial power to hear again the controversy notwithstanding prior determinations of substantially identical federal issues by the highest state court, either on direct review of the conviction or by post-conviction remedy, habeas corpus, coram nobis, delayed appeal or otherwise.[10]

Jurisdiction over applications for federal habeas corpus is controlled by statute.[11] The Code directs a court en-

---

[9] Rule 52, Fed. Rules Crim. Proc.; *Berger* v. *United States,* 295 U. S. 78, 81–84. See *Kotteakos* v. *United States,* 328 U. S. 750, 763; *Bihn* v. *United States,* 328 U. S. 633.

[10] See note 15, *infra.*

[11] 28 U. S. C. § 2241 (a).

tertaining an application to award the writ.[12]  But an application is not "entertained" by a mere filing.  Liberal as the courts are and should be as to practice in setting out claimed violations of constitutional rights, the applicant must meet the statutory test of alleging facts that entitle him to relief.[13]

The word "entertain" presents difficulties.  Its meaning may vary according to its surroundings.[14]  In § 2243 and § 2244 we think it means a federal district court's conclusion, after examination of the application with such accompanying papers as the court deems necessary, that a hearing on the merits legal or factual is proper.  See *Walker* v. *Johnston,* 312 U. S. 275, 283, First and Second; *Smith* v. *Baldi, post,* p. 561, at p. 568.  Even after deciding to entertain the application, the District Court may determine later from the return or otherwise that the hearing is unnecessary.

It is clear by statutory enactment that a federal district court is not required to entertain an application for habeas corpus if it appears that "the legality of such detention has been determined by a judge or court of the

---

[12] 28 U. S. C. § 2243:

"A court, justice or judge entertaining an application for a writ of habeas corpus shall forthwith award the writ or issue an order directing the respondent to show cause why the writ should not be granted, unless it appears from the application that the applicant or person detained is not entitled thereto. . . .

.        .        .        .        .

"Unless the application for the writ and the return present only issues of law the person to whom the writ is directed shall be required to produce at the hearing the body of the person detained.

.        .        .        .        .

"The court shall summarily hear and determine the facts, and dispose of the matter as law and justice require."

[13] 28 U. S. C. § 2242.  *Darr* v. *Burford, supra,* p. 203.  See § 2243, *supra.*

[14] See *Denholm & McKay Co.* v. *Commissioner,* 132 F. 2d 243, 247, and cases cited.

United States on a prior application for a writ of habeas corpus." [15]   The Reviser's Notes to this section in House Report No. 308, 80th Cong., 1st Sess., say that no material change in existing practice is intended.   Nothing else indicates that the purpose of Congress was to restrict by the adoption of the Code of 1948 the discretion of the District Court, if it had such discretion before, to entertain petitions from state prisoners which raised the same issues raised in the state courts. [16]

Furthermore, in enacting 28 U. S. C. § 2254, dealing with persons in custody under state judgments, Congress made no reference to the power of a federal district court over federal habeas corpus for claimed wrongs previously passed upon by state courts. [17]   See discussion at p. 447, *supra*.   A federal judge on a habeas corpus application is required to "summarily hear and determine the facts, and dispose of the matter as law and justice require," 28 U. S. C. § 2243.   This has long been the law.   R. S. § 761,

---

[15] 28 U. S. C. § 2244:

"No circuit or district judge shall be required to entertain an application for a writ of habeas corpus to inquire into the detention of a person pursuant to a judgment of a court of the United States, or of any State, if it appears that the legality of such detention has been determined by a judge or court of the United States on a prior application for a writ of habeas corpus and the petition presents no new ground not theretofore presented and determined, and the judge or court is satisfied that the ends of justice will not be . served by such inquiry."   See S. Rep. No. 1559, 80th Cong., 2d Sess., Amendment No. 45.

[16] See H. R. 4232, 79th Cong., 1st Sess.; H. R. 3214, 80th Cong., 1st Sess.; H. R. 3214, 80th Cong., 2d Sess.; Report of the Judicial Conference of Senior Circuit Judges, 1947, pp. 17–20.

[17] 28 U. S. C. § 2254:

"An application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the State, or that there is either an absence of available State corrective process or the existence of

old 28 U. S. C. § 461. It was under this general rule that this Court approved in *Salinger* v. *Loisel,* 265 U. S. 224, 231, the procedure that a federal judge might refuse a writ where application for one had been made to and refused by another federal judge and the second judge is of the opinion that in the light of the record a satisfactory conclusion has been reached.[18] That principle is also applicable to state prisoners. *Darr* v. *Burford, supra,* 214–215.

Applications to district courts on grounds determined adversely to the applicant by state courts should follow the same principle—a refusal of the writ without more, if the court is satisfied, by the record, that the state process has given fair consideration to the issues and the offered evidence, and has resulted in a satisfactory conclusion. Where the record of the application affords an adequate opportunity to weigh the sufficiency of the allegations and the evidence, and no unusual circumstances calling for a hearing are presented, a repetition of the trial is not required. See p. 457, *supra.* However, a trial may be had in the discretion of the federal

circumstances rendering such process ineffective to protect the rights of the prisoner.

"An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented."

[18] The reason for the change in procedure was stated:

"But it does not follow that a refusal to discharge on one application is without bearing or weight when a later application is being considered. In early times when a refusal to discharge was not open to appellate review, courts and judges were accustomed to exercise an independent judgment on each successive application, regardless of the number. But when a right to an appellate review was given the reason for that practice ceased and the practice came to be materially changed,—just as when a right to a comprehensive review in criminal cases was given the scope of inquiry deemed admissible on *habeas corpus* came to be relatively narrowed." *Id.,* at 230–231.

court or judge hearing the new application. A way is left open to redress violations of the Constitution. See p. 447, *supra. Moore* v. *Dempsey,* 261 U. S. 86. Although they have the power, it is not necessary for federal courts to hold hearings on the merits, facts or law a second time when satisfied that federal constitutional rights have been protected.[19] It is necessary to exercise jurisdiction to the extent of determining by examination of the record whether or not a hearing would serve the ends of justice.

---

[19] When an application for habeas corpus by a state prisoner is filed in a federal district court after the exhaustion of state remedies, including a certiorari to this Court, it rests on a record that was made in the applicant's effort to secure relief through the state from imprisonment, allegedly in violation of .federal constitutional rights. The District Court, a court convenient to the place of litigation, 28 U. S. C. § 2241 (b), after determining grounds for relief are stated in the petition, "may require a showing of the record and action on prior applications." *Darr* v. *Burford, supra,* at 215; *Salinger* v. *Loisel,* 265 U. S. 224, 232; cf. *Ex parte Elmer Davis,* 318 U. S. 412. Original records in state courts are returned by this Court. (*E. g.,* see in *Daniels* v. *North Carolina,* 339 U. S. 954, the order of THE CHIEF JUSTICE of the United States, dated May 12, 1950, as the same remains upon the files of this Court, directing, on the application of petitioner's counsel, the return of the original record from the files of this Court to the Supreme Court of North Carolina.) Copies of petitions for certiorari are normally available to petitioners. See 28 U. S. C. § 2250. Other sections strengthen the ability of the court hearing the application fully to advise itself concerning prior hearings of the same issues for the applicant. 28 U. S. C. § 2245 allows a certificate as to certain facts; § 2246 provides for depositions and affidavits. Section 2247 makes liberal provision for the use of records of former proceedings in evidence. See also §§ 2248–2254, inclusive. Of course, the other usual methods of completing the record in civil cases, such as subpoena *duces tecum* and discovery, are generally available to the applicant and respondent. If useful records of prior litigation are difficult to secure or unobtainable, the District Court may find it necessary or desirable to hold limited hearings to supply them where the allegations of the application for habeas corpus state adequate grounds for relief.

Cf. 28 U. S. C. § 2244. See n. 15, *supra*. As the state and federal courts have the same responsibilities to protect persons from violation of their constitutional rights, we conclude that a federal district court may decline, without a rehearing of the facts, to award a writ of habeas corpus to a state prisoner where the legality of such detention has been determined, on the facts presented, by the highest state court with jurisdiction, whether through affirmance of the judgment on appeal or denial of postconviction remedies. See *White* v. *Ragen,* 324 U. S. 760, 764.

As will presently appear, this case involves no extraordinary situation. Since the complete record was before the District Court, there was no need for rehearing or taking of further evidence. Treating the state's response to the application as a motion to dismiss, the court properly granted that motion. Discharge from conviction through habeas corpus is not an act of judicial clemency but a protection against illegal custody.

The need for argument is a matter of judicial discretion. All issues were adequately presented. There was no abuse.

## IV. DISPOSITION OF CONSTITUTIONAL ISSUES.

Next we direct our attention to the records which were before the District Court in order to review that court's conclusions that North Carolina accorded petitioners a fair adjudication of their federal questions. Questions of discrimination and admission of coerced confessions lie in the compass of the Due Process and Equal Protection Clauses of the Fourteenth Amendment. Have petitioners received hearings consonant with standards accepted by this Nation as adequate to justify their convictions? *Hebert* v. *Louisiana,* 272 U. S. 312; *Adamson* v. *California,* 332 U. S. 46.

*First.* We take up *Brown* v. *Allen,* No. 32, a case that turns more generally than the others on the constitutional issues.

Petitioner, a Negro, was indicted on September 4, 1950, and tried in the North Carolina courts on a charge of rape, and, having been found guilty, he was sentenced to death on September 15, 1950. In the sentencing court petitioner made a timely motion to quash the bill of indictment, alleging discrimination against Negroes in the selection of grand jurors in contravention of the guarantees of the Fourteenth Amendment to the Federal Constitution. After the verdict, but before sentencing, petitioner, by a motion to set aside the verdict, sought to expand his constitutional attack on the selection of the grand jury to embrace the petit jury also. On appeal the State Supreme Court treated, as we do, petitioner's motions as adequate to challenge the selection of both juries. 233 N. C. 202, 205–206, 63 S. E. 2d 99, 100–101. A second federal question was raised in the sentencing court when petitioner opposed admission into evidence of a confession which he alleged had been given involuntarily. Following sentencing, petitioner took an appeal to the State Supreme Court and there presented for review the issues of jury discrimination and admission of a coerced confession. On this appeal, that court had before it both a brief on behalf of petitioner and a transcript of all those portions of the sentencing court proceedings which petitioner deemed relevant to a review of his federal questions.[20] Dealing with the federal constitutional questions on their merits, the State Supreme Court

---

[20] Rule 19 of the Rules of the Supreme Court of North Carolina permits an appellant to bring up on appeal as much of the record as is necessary "to an understanding of the exceptions relied on." Petitioner does not contend that the record before the Supreme Court of North Carolina was inadequate fully to support an adjudication on his federal questions.

affirmed the conviction.  *State* v. *Brown,* 233 N. C. 202, 63 S. E. 2d 99.

A. Petitioner's charge of discrimination against Negroes in the selection of grand and petit jurors in violation of his constitutional rights attacks the operation of a method used by North Carolina in selecting juries in Forsyth County.  The statutes detailing the method of selection are cited below.[21]  It is petitioner's contention that no more than one or two Negroes at a time have ever served on a Forsyth County grand jury and that no more than five Negroes have ever previously served on a petit jury panel in the county.  These contentions are the basis of the allegation that a system of discrimination is being employed against the Negro residents of the county.  Petitioner offered no evidence to support his charge of limitation against the jury service of Negroes, except the fact that fewer Negroes than whites, having regard for their proportion of the population, appeared on the jury panels.

The 1940 Census shows the following figures in respect to the population of Forsyth County.

|  | Population | Percent | 21 Plus | Percent |
|---|---|---|---|---|
| White ............. | 85,323 | 67.5 | 50,499 | 66.5 |
| Negro ............. | 41,152 | 32.5 | 25,057 | 33.5 |
| Total ........... | 126,475 | 100.0 | 75,556 | 100.0 |

According to the unchallenged testimony of the IBM Supervisor in the office of the Tax Supervisor of Forsyth County, a list of names is compiled from a tabulation of all the county property and poll taxpayers who make returns and is thereafter tendered to the County Commissioners for use in jury selection.  All males

---

[21] See Chapter 206, 1937 Public-Local Laws (as amended by Chapter 264, 1947 N. C. Session Laws, and as amended by Chapter 577, 1949 N. C. Session Laws).  And Gen. Stats. of N. C., 1943, c. 9, Arts. 1–4, as amended.

between 21 and 50 years of age are required to list themselves for poll tax as well as to list their property. Gen. Stat. of North Carolina, Recompiled 1950, §§ 105–307, 105–341. In 1948, Winston Township, the most heavily populated in Forsyth County, had 7,659 white males and 2,752 colored males who listed polls. In the County of Forsyth outside Winston Township, 10,319 white males and 587 colored males listed polls. This indicates that Negroes number approximately 16% of the listed taxpayers. No figures appear in the record of the percentage of Negroes on the property tax lists.

In June 1949, a list of approximately 40,000 names compiled from all the tax lists was handed to the Commissioners by the office of the Tax Supervisor. There is uncontradicted testimony by the IBM Supervisor that the list of jurors was prepared without regard to color, and that it constituted a complete compilation of the names of all resident, adult, listed taxpayers of Forsyth County. Both the grand and petit jury panels employed in this case were drawn from that pool. All the names on that list and no others (the list having been cut up into individual slips of uniform size bearing only one person's name) were put into a jury box. The selection from the jury box of names of persons subject to a summons to serve as grand jurors in a term of court is made by lot, as is the selection of panels of persons subject to summons for duty on petit juries. As the drawings were made by a small child and recorded in public there is no claim or evidence of chicanery in the drawings.

Grand jurors in Forsyth County are selected in January and July for a six months' term. See c. 206, 1937 Public-Local Laws, as amended by c. 264, 1947 N. C. Session Laws, as amended by c. 577, 1949 N. C. Session Laws. A panel of 60 names is drawn from the jury box each December and June by a child in the presence of the County Commissioners. At the June 5, 1950, meeting of the

Commissioners, 60 names were drawn. These 60 names constituted the panel of persons subject to summons for service on the grand jury which returned the indictment against petitioner. After such a drawing, a jury order is immediately prepared and given to the sheriff, who then summons all the parties he can find to appear for drawings for grand or petit jury service, as the case may be. All persons whose names were drawn were summoned if they could be found. Although there is no evidence as to how many persons were summoned by the sheriff, there is evidence to show that at least four or five Negroes were summoned. The final drawing for grand jury service is conducted in the courtroom in the presence of the Superior Court Judge. When the July 1950 grand jury was selected from the panel of 60, the drawing was again made by a child. The names of all the persons summoned by the sheriff were put into a special section of the jury box and the 18-man grand jury was then drawn. The name of one of the four or five Negroes summoned was drawn in the group of 18, and that Negro served on the grand jury. The remaining names are used for the petit jury panel.

When they are needed, petit jury panels in Forsyth County are drawn from the same jury box in groups of 44 persons. C. 206, Public-Local Laws, *supra*. After a drawing, the names are given to a deputy sheriff who then summons those persons on the list whom he can find. On the lists supplied to the deputies there are no indications as to whether the persons named are Negro or white. According to the statute all summoned persons must report for jury service. At the selection of the petit jurors for the trial of this case 8 of the 37 persons summoned on the panel were Negroes, as were 3 of a special venire of 20. Challenges, peremptory or for cause, eliminated all Negroes. No objections are made to the legality of these challenges. Uncontradicted evidence by a state witness

shows that in the two years 1949 and 1950 the percentages of Negroes drawn on grand jury panels in Forsyth County varied between 7% and 10% of all persons drawn. In 1950 the percentage of Negroes drawn on petit jury panels varied between 9% and 17% of all persons drawn.

Prior to 1947, the jury list was composed of those taxpayers who had "paid all the taxes assessed against them for the preceding year." N. C. Gen. Stat., 1943, § 9–1; cf. *State* v. *Davis*, 109 N. C. 780, 14 S. E. 55; *State* v. *Dixon*, 131 N. C. 808, 44 S. E. 944. This requirement has now been removed, as is shown by comparing the earlier statutes with the present wording of § 9–1 which was put into law in 1947. No change was made in the duty of all males between 21 and 50 to list their polls for assessment nor of the requirement for the county to collect an annual poll tax. Gen. Stat. §§ 105–307, 105–336, 105–339, 105–341; cf. *State* v. *Brown*, 233 N. C. 202, 205, 63 S. E. 2d 99, 100–101. The pool of eligible jurors was thus enlarged. This enlargement and the practice of selecting jurors under the new statute worked a radical change in the racial proportions of drawings of jurors in Forsyth County. As is shown by the record in this Court of *Brunson* v. *North Carolina*, 333 U. S. 851, tried in North Carolina in October, 1946, Forsyth County with its large Negro population, at that time had a jury pool of 10,622 white and 255 colored citizens. At that time a sheriff, then in office for 10 years, testified that he had summoned only about twelve Negroes for jury service in that time. In 1949, the jury box was purged. All those listing taxes and eligible were listed for jury service with the result in this case shown above.

Discriminations against a race by barring or limiting citizens of that race from participation in jury service are odious to our thought and our Constitution. This has long been accepted as the law. *Brunson* v. *North Carolina*, 333 U. S. 851; *Cassell* v. *Texas*, 339 U. S. 282, 286–

287; *State* v. *Peoples,* 131 N. C. 784, 42 S. E. 814. Such discrimination is forbidden by statute, 18 U. S. C. § 243, and has been treated as a denial of equal protection under the Fourteenth Amendment to an accused, of the race against which such discrimination is directed. *Neal* v. *Delaware,* 103 U. S. 370. The discrimination forbidden is racial discrimination, however, directed to accomplish the result of eliminating or limiting the service of the proscribed race by statute or by practice. *Smith* v. *Texas,* 311 U. S. 128; *Patton* v. *Mississippi,* 332 U. S. 463. It was explained in 1880 by this Court, when composed of justices familiar with the evils the Amendment sought to remedy, as permitting a state to "confine the selection [of jurors] to males, to freeholders, to citizens, to persons within certain ages or to persons having educational qualifications." *Strauder* v. *West Virginia,* 100 U. S. 303, 310. Cf. *Franklin* v. *South Carolina,* 218 U. S. 161, 167–168; *Fay* v. *New York,* 332 U. S. 261, 268–272. While discriminations worked by consistent exclusion have been rigorously dealt with, *Neal* v. *Delaware,* 103 U. S. 370; *Carter* v. *Texas,* 177 U. S. 442; *Norris* v. *Alabama,* 294 U. S. 587; *Pierre* v. *Louisiana,* 306 U. S. 354; *Hill* v. *Texas,* 316 U. S. 400; *Patton* v. *Mississippi,* 332 U. S. 463, variations in proportions of Negroes and whites on jury lists from racial proportions in the population have not been considered violative of the Constitution where they are explained and not long continued. *Akins* v. *Texas,* 325 U. S. 398, 403. Of course, token summoning of Negroes for jury service does not comply with equal protection, *Smith* v. *Texas,* 311 U. S. 128. Nor can a race be proscribed as incompetent for service, *Hill* v. *Texas,* 316 U. S. 400.

Responsible as this Court is under the Constitution to redress the jury packing which Bentham properly characterized as a sinister species of art, Bentham, Elements of the Art of Packing as Applied to Special Juries, p. 6,

it should not condemn good faith efforts to secure competent juries merely because of varying racial proportions.

The Supreme Court of North Carolina concluded that objection to the lists based on the racial composition of the tax lists was "far-fetched" and that it was not a racial discrimination when a list which included only taxpayers was used. *State* v. *Brown*, 233 N. C. 202, 63 S. E. 2d 99.[22]

---

[22] In addition to North Carolina, the following states are among those which also base the composition of jury lists on tax lists:

Colo. Stat. Ann., 1952 Replacement, c. 95, § 10 (may use tax list);

Ga. Code Ann., 1951, § 59.106 (jury commissioners "shall select from the books of the tax receiver");

Kan. Gen. Stat., 1949, c. 43 ("select from those assessed on the assessment roll of the preceding year");

Ky. Rev. Stat., 1948, § 29.070 (last returned tax commissioner's book);

Md. Ann. Code, 1939, Art. 51, ¶ 6 (from a "complete list of male taxable inhabitants . . . whose names appear on the tax books");

Mich. Stat. Ann., 1938 and 1951, §§ 27.246 and 27.247 (select from "persons assessed on the assessment roll"; provides for additional names);

Mont. Rev. Code, 1947, Tit. 93, § 1402 ("select, from the last assessment roll of the county");

McKinney's N. Y. Laws, Judiciary Law, § 502 (1948) (own real property $150, or personal property $250, or married to someone who does; jurors in counties outside of cities having a population of one million or more). McKinney's N. Y. Laws, Judiciary Law, § 596;

N. D. Rev. Code, 1943, § 27–0906 ("The names on the assessors' lists . . . for the preceding year shall be the basis for making" an apportionment of the 200 names per county to the various cities and towns within the county);

Okla. Stat. Ann., 1951, Tit. 38, § 18 (jury lists shall be selected from the names on the tax rolls of the county);

Ore. Comp. Laws Ann., 1940, § 14–201 (make a jury list, "as far as it may be able to ascertain the same from the latest tax roll and/or registration books of the county");

Utah Code Ann., 1943, § 48–0–17 ("select from the names of the legal voters on the assessment roll . . .");

Remington's Wash. Rev. Stat., 1932, § 94 (no person is competent

We recognize the fact that these lists have a higher proportion of white citizens than of colored, doubtless due to inequality of educational and economic opportunities. While those who chose the names for the jury lists might have included names other than taxpayers, such action was not mandatory under state law. *State* v. *Brown,* 233 N. C. 202, 205, 63 S. E. 2d 99, 100. As only property and poll tax lists were used, see p. 467, *supra,* this case presents a jury selection as though limited by statute to all property owners and voters. We assume only reasonable tax levies were used. It is to be noted all males between 21 and 50 must list both property, however modest in amount, and polls, see pp. 467–468, *supra,* so that in that sense there is no exclusion on racial grounds. The name of every property owner and every voter is in the jury box. We recognize, too, that we are now reviewing a constitutional objection to a state court conviction, and we may not act to alter practices of a state which are short of a denial of equal protection or due process in the selection of juries.[23] States should decide for themselves the quality of their juries as best fits their situation so long as the classifications have relation to the efficiency of the jurors and are equally administered.

---

to serve as a juror unless he be (1) an elector and taxpayer of the state);

Wyo. Comp. Stat., 1945, § 12–101 (4) (a person is competent if he be (4) assessed on the last assessment roll of the county).

See also Morse, A Survey of the Grand Jury System, Part 2, 10 Ore. L. Rev. 217, 227 (1931). The answers to the questionnaires sent out by Mr. Morse indicated that in twenty-two states the names for the grand jury lists were selected from county tax rolls or assessment rolls.

[23] Rules dealing with the selection of juries in federal courts, as announced in *Thiel* v. *Southern Pacific Co.,* 328 U. S. 217, 221, are not applicable in state court proceedings. *Fay* v. *New York,* 332 U. S. 261, 287.

Our duty to protect the federal constitutional rights of all does not mean we must or should impose on states our conception of the proper source of jury lists, so long as the source reasonably reflects a cross-section of the population suitable in character and intelligence for that civic duty. Short of an annual census or required population registration, these tax lists offer the most comprehensive source of available names. We do not think a use, nondiscriminatory as to race, of the tax lists violates the Fourteenth Amendment, nor can we conclude on the evidence adduced that the results of the use require a conclusion of unconstitutionality. Assuming that before the *Brunson* case, 333 U. S. 851, there were unconstitutional exclusions of Negroes in this North Carolina county, the present record does not show such exclusions in this case. The evidence is to the contrary. The District Court correctly determined this issue as to the grand jury. As both the grand and petit juries in this case were drawn from the same filling of the jury box, the reasoning of the District Court is applicable to the petit jury here involved.

B. Petitioner contends further that his conviction was procured in violation of the Fourteenth Amendment of the Federal Constitution because the trial judge permitted the jury to rely on a confession claimed by petitioner to be coerced in determining his guilt. At the trial petitioner registered timely objection to use by the state of his purported confessions. The objection having been made, the trial judge immediately excused the jury and ordered a preliminary examination to determine whether or not the statements were voluntary. It was in this preliminary hearing, in which the petitioner and two police officers testified, that the admitted facts were first developed upon which petitioner rests this phase of his case. After hearing the testimony, the trial judge found that the petitioner's statements were freely and voluntarily given and declared them to be competent.

Upon recall of the jury, the state introduced the statements in evidence, objections again being noted. Although the petitioner chose not to take the stand in the trial of his cause, his counsel, while cross-examining the officers who had taken the challenged statements from the petitioner, developed again for the jury all the facts upon which petitioner now relies.

A conviction by a trial court which has admitted coerced confessions deprives a defendant of liberty without due process of law. *Brown* v. *Mississippi,* 297 U. S. 278, 280, 286–287. When the facts admitted by the state show coercion, *Ashcraft* v. *Tennessee,* 327 U. S. 274, a conviction will be set aside as violative of due process. *Chambers* v. *Florida,* 309 U. S. 227. This is true even though the evidence apart from the confessions might have been sufficient to sustain the jury's verdict. *Malinski* v. *New York,* 324 U. S. 401; see *Lyons* v. *Oklahoma,* 322 U. S. 596, 597.

Therefore, it does not matter in this case whether or not the jury was acquainted with all the facts laid before the judge upon which petitioner now relies or whether the jury heard or did not hear the petitioner testify. Neither does it matter that there possibly is evidence in the record independent of the confessions which could sustain the verdict. The mere admission of the confessions by the trial judge constituted a use of them by the state, and if the confessions were improperly obtained, such a use constitutes a denial of due process of law as guaranteed by the Fourteenth Amendment. In determining whether a confession has been used by the state in violation of the constitutional rights of a petitioner, a United States court appraises the alleged abuses by the facts as shown at the hearing or admitted on the record.

Petitioner's contention that he had a constitutional right to have his statements excluded from the record rests upon these admitted facts. He is an illiterate.

He was held after arrest for five days before being charged with the crime for which he was convicted. He was not given a preliminary hearing until 18 days after his arrest. No counsel was provided for him in the period of his detention. The alleged confessions were taken prior to the preliminary hearing and appointment of counsel. There is no record of physical coercion or of that less painful duress generated by prolonged questioning. There is evidence that petitioner was told he could remain silent and that any statement he might make could be used against him. He chose to speak, and he made that choice without a promise of reward or immunity having been extended. He was never denied the right to counsel of his choice and was never without competent counsel from the inception of judicial proceedings. If the delay in the arraignment of petitioner was greater than that which might be tolerated in a federal criminal proceding, due process was not violated. Under the leadership of this Court a rule has been adopted for federal courts, that denies admission to confessions obtained before prompt arraignment notwithstanding their voluntary character. *McNabb* v. *United States,* 318 U. S. 332; *Upshaw* v. *United States,* 335 U. S. 410. Cf. *Allen* v. *United States,* 91 U. S. App. D. C. 197, 202 F. 2d 329. This experiment has been made in an attempt to abolish the opportunities for coercion which prolonged detention without a hearing is said to enhance. But the federal rule does not arise from constitutional sources. The Court has repeatedly refused to convert this rule of evidence for federal courts into a constitutional limitation on the states. *Gallegos* v. *Nebraska,* 342 U. S. 55, 63–65. Mere detention and police examination in private of one in official state custody do not render involuntary the statements or confessions made by the person so detained. Petitioner's constitutional rights were not infringed by the refusal of the trial court to exclude his confessions as evidence.

*Second.* We examine the constitutional issues in No. 22, *Speller* v. *Allen.*

Petitioner, a Negro, was indicted and in August, 1949, tried in the Superior Court of Bertie County, North Carolina, upon a charge of rape. He has been convicted and sentenced to death on this charge three times, the first two convictions having been set aside on appeal by the Supreme Court of North Carolina on the ground of discriminatory selection of jurors. *State* v. *Speller,* 229 N. C. 67, 47 S. E. 2d 537; 230 N. C. 345, 53 S. E. 2d 294. At this, his third trial, August Term 1949, petitioner made a timely motion to set aside the array of special veniremen called from Vance County, alleging discrimination against Negroes "solely and wholly on account of their race and/or color" in the selection of the veniremen in contravention of the guarantees of the Fourteenth Amendment of the Federal Constitution. (Transcript of Record, *State* v. *Speller,* August Term 1949, Bertie N. C. Superior Court at 12, Item 91, Clerk's Record, Supreme Court of the United States.) Evidence was taken at length on this issue, although some evidence deemed material by petitioner was excluded. In particular, the trial judge, on the ground that it would be immaterial, *infra,* p. 480, refused to permit petitioner to produce evidence as to all the scrolls in the jury box for the purpose of showing the existence of dots on the scrolls bearing the names of Negroes. The jury box was produced in court, opened, and counsel for defendant permitted to examine the scrolls. The trial judge made findings relating to the manner of selecting the veniremen, determining that no discrimination was practiced, and on these findings denied the motion to set aside the array. Petitioner was thereafter convicted for the third time, and sentenced to death.

On appeal petitioner asserted that his conviction violated the Equal Protection Clause of the Fourteenth

Amendment, assigning the denial of his motion to set aside the array as error, and also assigning as error the trial court's ruling on his request for permission to examine into all the scrolls in the jury box. The Supreme Court of North Carolina had before it on that appeal as part of the record a mimeographed, narrative-style transcript of the entire proceedings below; petitioner makes no objection to the absence of any relevant evidence on that appeal, except that relating to all the scrolls which had been excluded by the trial court. Upholding the rulings of the trial court, the Supreme Court of North Carolina affirmed the conviction, 231 N. C. 549, 57 S. E. 2d 759.

Petitioner filed this petition for a writ of habeas corpus in the Federal District Court for the Eastern District of North Carolina after we denied certiorari on direct review of the state proceedings. The petition summarily recited the prior history of the litigation, and raised again the same federal question which had been passed upon by both North Carolina courts, and which had been offered to this Court on petition for certiorari, racial discrimination. The District Court heard all additional evidence the petitioner offered. This was in its discretion. *Moore* v. *Dempsey,* 261 U. S. 86; *Darr* v. *Burford,* 339 U. S., at 214, cases which establish the power of federal district courts to protect the constitutional rights of state prisoners after the exhaustion of state remedies. It better enabled that court to determine whether any violation of the Fourteenth Amendment occurred.

Petitioner's charge of discrimination against Negroes in the selection of petit jurors in violation of his constitutional rights attacks the operation of the system used by the North Carolina authorities to select juries in Vance County, from which county a special venire was obtained to try petitioner. The charge rests on petitioner's contentions (1) that no Negro within recent

years had served on a jury in Vance County before this case, (2) that no Negro had been summoned to serve on a jury before this case, and (3) that the jury box in this case was so heavily loaded with names of white persons that the drawing could not fairly reflect a cross-section of those persons in the community qualified for jury service. Petitioner offered evidence to support each of these three contentions.

The evidence establishes the correctness of contentions (1) and (2). They are inapplicable to this case, however, under the circumstances of the filling of this particular jury box. As is pointed out in *Brown* v. *Allen, supra,* at page 470, North Carolina in 1947 enlarged its pool of citizens eligible for jury service. General Statutes, North Carolina, § 9–1. In Vance County, where the special venire for Speller's trial was drawn, the names of substantial numbers of Negroes appeared thereafter in the jury box. 145 Negroes out of a total of 2,126 names were in this jury box. As this venire was the first drawing of jurors from the box after its purge in July 1949, following the new statute and *Brunson* v. *North Carolina,* 333 U. S. 851, decided here March 15, 1948, the long history of alleged discrimination against its Negro citizens by Vance County jury commissioners is not decisive of discrimination in the present case. Former errors cannot invalidate future trials. Our problem is whether this venire was drawn from a jury box invalidly filled as to Speller because names were selected by discriminating against Negroes "solely on account of race and/or color." It is this particular box that is decisive, cf. *Cassell* v. *Texas,* 339 U. S. 282, 290 and 295. Past practice is evidence of past attitude of mind. That attitude is shown to no longer control the action of officials by the present fact of colored citizens' names in the jury box.

It is suggested that the record shows that the names of colored persons in the jury box were marked with a dot or period on the scroll. This could be used for unlawful disposition of such scrolls when drawn. Such a scheme would be useless in the circumstances of this case. The record shows that the defendant and his counsel were present when the venire was drawn by a child, aged 5. All of the names drawn were given to the sheriff and summonses were issued. As a matter of fact the special venire contained the names of seven Negroes. Four appeared. None sat as jurors. Therefore the assertion as to the dots, even if true, means no more than that some unknown person desired to interfere with the fair drawing of juries in Vance County. The trial court found against petitioner on this question. The District Court pointed out its immateriality. 99 F. Supp., at 97.

This box was filled by names selected by the clerk of the jury commissioners and corrected by the commissioners. The names put in were substantially those selected by the clerk, who chose them from those on the tax lists who had "the most property." The clerk testified no racial discrimination entered into his selection. Since the effect of this possible objection to the selection of jurors on an economic basis was not raised or developed at the trial, on appeal to the State Supreme Court, on the former certiorari to this Court, or in the petition or brief on the present certiorari to this Court, it is not open to consideration here.[24] Such an important

---

[24] Evidence in state criminal proceedings to support objections on federal constitutional grounds, known to state defendants and their counsel, or easily ascertainable, cannot be withheld or neglected at the state trial and used later to support habeas corpus. State criminal proceedings would be unreasonably hampered. *Ex parte Spencer,* 228 U. S. 652, 660; *In re Wood,* 140 U. S. 278, 285; *Crowe* v. *United States,* 175 F. 2d 799; *Price* v. *Johnston,* 334 U. S. 266, 289, and the dissent.

national asset as state autonomy in local law enforcement must not be eroded through indefinite charges of unconstitutional actions.

As we have stated above in discussing the *Brown* case, page 473, *et seq., supra,* our conclusion that selection of prospective jurors may be made from such tax lists as those required under North Carolina statutes without violation of the Federal Constitution, this point needs no further elaboration. The fact that causes further consideration in this case of the selection of prospective jurors is that the tax lists show 8,233 individual taxpayers in Vance County of whom 3,136 or 38% are Negroes. In the jury box involved, selected from that list, there were 2,126 names. Of that number 145 were Negroes, 7%. This disparity between the races would not be accepted by this Court solely on the evidence of the clerk of the commissioners that he selected names of citizens of "good moral character and qualified to serve as jurors, and who had paid their taxes." [25] It would not be assumed that in Vance County there is not a much larger percentage of Negroes with qualifications of jurymen.[26] The action of the commissioners' clerk, however, in selecting those with "the most property," an economic basis not attacked here, might well account for the few Negroes appearing in the box. Evidence of discrimination based solely on race in the selection actually made is lacking.

The trial and district courts, after hearing witnesses, found no racial discrimination in the selection of the prospective jurors. The conviction was upheld as non-

---

[25] We understand his last basis of qualification was not required. See *Brown* v. *Allen, supra,* page 470, and General Statutes of North Carolina, § 9–1 as amended 1947.

[26] Moral character and intelligence sufficient to serve as jurors is the statutory test. N. C. Gen. Stat., 1943, § 9–1. Even in 1930 only 18.5% over 10 years of age were illiterate. 1930 Census, Vol. III, part 2, p. 359. See *Hill* v. *Texas,* 316 U. S. 400, 404.

discriminatory by the State Supreme Court, which had once acted to reverse a conviction of this defendant by a jury deemed tainted with racial discrimination, *State* v. *Speller*, 229 N. C. 67, 47 S. E. 2d 537, and again to reverse a conviction when adequate time for investigation of discrimination had not been given. *State* v. *Speller*, 230 N. C. 345, 53 S. E. 2d 294. It would require a conviction, by this Court, of violation of equal protection through racial discrimination to set aside this trial. Our delicate and serious responsibility of compelling state conformity to the Constitution by overturning state criminal convictions, should not be exercised without clear evidence of violation.

Disregarding, as we think we should, the clerk's unchallenged selections based on taxable property, there is no evidence of racial discrimination. Negroes' names now appear in the jury box. If the requirement of comparative wealth is eliminated, and the statutory standards employed, the number would increase to the equality justified by their moral and educational qualification for jury service as compared with the white race. We do not think the small number, by comparison, of Negro names in this one jury box, is, in itself, enough to establish racial discrimination.

*Third.* We have the problems presented by No. 20, *Daniels* v. *Allen*. The two petitioners, Negroes, were indicted and convicted in the North Carolina courts on a charge of murder. Their trial in the Superior Court of Pitt County resulted in a verdict of guilty, and each petitioner was thereafter sentenced to death. There is no issue over guilt under the evidence introduced. In addition to the objections stated above at p. 453—discrimination in jury lists, coerced confessions and refusal to hear on the merits—there is also objection here to the procedure for determination of the voluntariness of the con-

fessions. As the failure to serve the statement of the case on appeal seems to us decisive, we do not discuss in detail the other constitutional issues tendered and only point out that they were resolved against the petitioners by the sentencing state court and the Federal District Court after full hearing of the evidence offered. It is also to be noted that the Supreme Court of North Carolina refused certiorari to review the alleged invasions of constitutional rights by the sentencing court and two efforts of petitioners to secure an order permitting them to apply for *coram nobis*.[27] The writ of *coram nobis* is available in North Carolina to test constitutional rights extraneous of the record. *In re Taylor*, 230 N. C. 566, 53 S. E. 2d 857. In the first *coram nobis* case the Court said, speaking of its refusal of certiorari:

> "Counsel for petitioners were advised, however, that petition might be filed here for permission to apply to the Superior Court of Pitt County, where the cause was tried, for a writ of error *coram nobis,* through which, if allowed there, they might be heard on the main features on which they asked for relief, which included matters *dehors* the record, and that appeal would lie to the Supreme Court in the event of its unfavorable action. *S. v. Daniels, supra; In re Taylor* (230 N. C.), *supra; In re Taylor* (229 N. C.), supra.
>
> "The defendants now file a petition for permission to apply to the Superior Court for such a writ. Their petition does not make a *prima facie* showing of substance which is necessary to bring themselves within the purview of the writ."[28]   231 N. C. 341, 56 S. E. 2d 646, 647.

---

[27] *State* v. *Daniels*, 231 N. C. 17, 56 S. E. 2d 2; 231 N. C. 341, 56 S. E. 2d 646; 232 N. C. 196, 59 S. E. 2d 430.

[28] Compare *Taylor* v. *Alabama*, 335 U. S. 252.

484

After the refusal of the first *coram nobis* petition, the Supreme Court of North Carolina dismissed petitioners' attempted appeal on the record proper on the ground that no case on appeal had been filed. 231 N. C. 509, 57 S. E. 2d 653; Rule 17, 4 N. C. Gen. Stat., App.; *id.,* Vol. 1, § 1–282. Such action accords with well-settled practice in that state. "Rules requiring service to be made of case on appeal within the allotted time are mandatory." 231 N. C. 17, 24, 56 S. E. 2d 2, 7. They are applied alike to all appellants.[29] The first application for certiorari to this Court raised federal constitutional objections to the judgments of the Supreme Court of North Carolina on both direct and collateral attack by certiorari and *coram nobis* on the judgment of the trial court. 339 U. S. 954.

The failure to perfect the appeal came in this way. Upon the coming in of the verdict on June 6, 1949, the petitioners several times moved for a new trial, in each motion reiterating one or the other of the aforementioned federal questions. These motions were denied, and the trial court pronounced its sentence. Petitioners excepted to the judgments and noted appeals therefrom to the State Supreme Court. In response to petitioners' notice, the trial judge granted petitioners 60 days in which to make and serve a statement of the case on appeal. When counsel failed to serve this statement until 61 days had expired, the trial judge struck the appeal as out of

---

[29] *State* v. *Watson,* 208 N. C. 70, 71, 179 S. E. 455, 456, is a capital case where the prisoner "failed to make out and serve statement of case on appeal within the statutory period." He lost his right to prosecute the appeal, and it was dismissed. The court pointed out, however, that it was customary in capital cases to examine the record to see that no error appeared on its face. In *State* v. *Morrow,* 220 N. C. 441, 17 S. E. 2d 507, the identical procedure was followed. In *State* v. *Moore,* 210 N. C. 686, 188 S. E. 421, and *State* v. *Lampkin,* 227 N. C. 620, 44 S. E. 2d 30, also capital cases, writs of certiorari were denied when the statement of the case on appeal had not been filed within the statutory period.

time. This action precluded an appeal as of right to the State Supreme Court.

This situation confronts us. North Carolina furnished a criminal court for the trial of those charged with crime. Petitioners at all times had counsel, chosen by themselves and recognized by North Carolina as competent to conduct the defense. In that court all petitioners' objections and proposals whether of jury discrimination, admission of confessions, instructions or otherwise were heard and decided against petitioners. The state furnished an adequate and easily-complied-with method of appeal. This included a means to serve the statement of the case on appeal in the absence of the prosecutor from his office. *State* v. *Daniels,* 231 N. C. 17, 24, 56 S. E. 2d 2, 7. Yet petitioners' appeal was not taken and the State of North Carolina, although the full trial record and statement on appeal were before it, refused to consider the appeal on its merits.[30]

The writ of habeas corpus in federal courts is not authorized for state prisoners at the discretion of the federal court. It is only authorized when a state prisoner is in custody in violation of the Constitution of the United States. 28 U. S. C. § 2241. That fact is not to be tested by the use of habeas corpus in lieu of an appeal.[31] To allow habeas corpus in such circumstances would subvert the entire system of state criminal justice and destroy state energy in the detection and punishment of crime.

Of course, federal habeas corpus is allowed where time has expired without appeal when the prisoner is detained without opportunity to appeal because of lack of counsel,

---

[30] *State* v. *Daniels,* 231 N. C. 17, 20 (11), 56 S. E. 2d 2, 4; Gen. Stat. of N. C., 1943, § 1–587.

[31] *Sunal* v. *Large,* 332 U. S. 174, 180; *Eagles* v. *Samuels,* 329 U. S. 304, 311; *In re Yamashita,* 327 U. S. 1, 8; *Johnson* v. *Zerbst,* 304 U. S. 458, 465; *Goto* v. *Lane,* 265 U. S. 393.

incapacity, or some interference by officials.[32] Also, this Court will review state habeas corpus proceedings even though no appeal was taken, if the state treated habeas corpus as permissible.[33] Federal habeas corpus is available following our refusal to review such state habeas corpus proceedings.[34] Failure to appeal is much like a failure to raise a known and existing question of unconstitutional proceeding or action prior to conviction or commitment. Such failure, of course, bars subsequent objection to conviction on those grounds.[35]

North Carolina has applied its law in refusing this out-of-time review.[36] This Court applies its jurisdictional statute in the same manner. *Preston* v. *Texas,* 343 U. S. 917, 933; cf. *Paonessa* v. *New York,* 344 U. S. 860, certiorari denied because "application therefor was not made within the time provided by law." We cannot say that North Carolina's action in refusing review after failure to perfect the case on appeal violates the Federal Constitution. A period of limitation accords with our conception of proper procedure.

Finally, federal courts may not grant habeas corpus for those convicted by the state except pursuant to § 2254.

---

[32] *Dowd* v. *Cook,* 340 U. S. 206; see *De Meerleer* v. *Michigan,* 329 U. S. 663; *Johnson* v. *Zerbst,* 304 U. S. 458.

[33] *Hawk* v. *Olson,* 326 U. S. 271, 278; *Herndon* v. *Lowry,* 301 U. S. 242, 247.

[34] *Smith* v. *Baldi,* decided today, *post,* p. 561, at pp. 569–570.

[35] *Darr* v. *Burford, supra,* at 203; *Ex parte Spencer,* 228 U. S. 652, 660. See *In re Wood,* 140 U. S. 278.

[36] See *McKane* v. *Durston,* 153 U. S. 684, 687, where this Court said: "An appeal from a judgment of conviction is not a matter of absolute right, independently of constitutional or statutory provisions allowing such appeal. A review by an appellate court of the final judgment in a criminal case, however grave the offence of which the accused is convicted, was not at common law and is not now a necessary element of due process of law. It is wholly within the discretion of the State to allow or not to allow such a review. A citation of authorities upon the point is unnecessary."

See note 17, *supra*. See also note 2, *supra*. We have interpreted § 2254 as not requiring repetitious applications to state courts for collateral relief, p. 447, *supra*, but clearly the state's procedure for relief must be employed in order to avoid the use of federal habeas corpus as a matter of procedural routine to review state criminal rulings. A failure to use a state's available remedy, in the absence of some interference or incapacity, such as is referred to just above at notes 32 and 33, bars federal habeas corpus. The statute requires that the applicant exhaust available state remedies. To show that the time has passed for appeal is not enough to empower the Federal District Court to issue the writ. The judgment must be affirmed.

We have spoken in this opinion of the change of practice in North Carolina in the selection of jurors. Our conclusions have been reached without regard to earlier incidents not connected with these juries or trials that suggest past discriminations. Since the states are the real guardians of peace and order within their boundaries, it is hoped that our consideration of these records will tend to clarify the requirements of the Federal Constitution in the selection of juries. Our Constitution requires that jurors be selected without inclusion or exclusion because of race. There must be neither limitation nor representation for color. By that practice, harmony has an opportunity to maintain essential discipline, without that objectionable domination which is so inconsistent with our constitutional democracy.

*The judgments are affirmed.*

MR. JUSTICE JACKSON concurs in this result for the reasons stated in a separate opinion. [See *post*, pp. 532, 548.]

MR. JUSTICE BURTON and MR. JUSTICE CLARK adhere to their position as stated in *Darr* v. *Burford*, 339 U. S. 200, at 219. They believe that the nature of the proceed-

ing upon a petition for certiorari is such that, when the reasons for a denial of certiorari are not stated, the denial should be disregarded in passing upon a subsequent application for relief, except to note that this source of possible relief has been exhausted.

They join in the judgment of the Court in these cases and they concur in the opinion of the Court except insofar as it may contain, in Part II, Subdivision A (pp. 456–457), or elsewhere, any indication that, although the reasons for a denial of certiorari be not stated, those reasons nevertheless may be inferred from the record. They also recognize the propriety of the considerations to which MR. JUSTICE FRANKFURTER invites the attention of a federal court when confronted with a petition for a writ of habeas corpus under the circumstances stated.

MR. JUSTICE FRANKFURTER.*

The course of litigation in these cases and their relevant facts are set out in MR. JUSTICE REED's opinion. This opinion is restricted to the two general questions which must be considered before the Court can pass on the specific situations presented by these cases. The two general problems are these:

I. The legal significance of a denial of certiorari, in a case required to be presented here under the doctrine of *Darr* v. *Burford*, 339 U. S. 200, when an application for a writ of habeas corpus thereafter comes before a district court.

II. The bearing that the proceedings in the State courts should have on the disposition of such an application in a district court.

*[For notation of position of MR. JUSTICE BURTON and MR. JUSTICE CLARK on the same points, see *ante*, p. 487; for notation of position of MR. JUSTICE BLACK and MR. JUSTICE DOUGLAS on the same points, see *post*, p. 513. In addition to the three cases decided in the Opinion of the Court, *ante*, p. 443, this opinion applies also to *United States ex rel. Smith* v. *Baldi, post*, p. 561.]

## I.

*Darr* v. *Burford* sheds no light on the effect a district court is to give our denial of certiorari in one of these cases. That decision was expressly limited to ruling that "ordinarily" the certiorari jurisdiction of this Court must be invoked in an attempt to secure review of a State court's refusal of relief prior to an application for habeas corpus in a district court. *Darr* v. *Burford,* 339 U. S., at 201, 214. The fact that two members of the necessary majority in *Darr* v. *Burford* deemed it appropriate to disavow concurrence in any "indication" in the Court's opinion that any effect is to be given to the denial of certiorari emphasizes that no such ruling can be attributed to *Darr* v. *Burford.* It was the view of MR. JUSTICE BURTON and MR. JUSTICE CLARK "that the nature of the proceeding is such that, when the reasons for a denial of certiorari are not stated, the denial should be disregarded in passing upon a subsequent application for relief, except to note that this source of possible relief has been exhausted." *Darr* v. *Burford, supra,* at 219. Of course, when the reasons are given, the decision to deny will have the effect indicated by the reasons stated. But we know best how puzzling it often would be to state why the Court denied certiorari even when we are parties to the denial.

In the three cases now here from the Fourth Circuit, the Court of Appeals relied heavily on our denial of certiorari in ruling against applications for federal habeas corpus by State prisoners.[1] Its opinion in No.

---

[1] In No. 20, *Daniels* v. *Allen,* after speaking of the denial of certiorari, the District Judge felt it difficult to believe "that any impartial person would conclude in the light of the procedural history of this case that it clearly appears that petitioners were denied the substance of a fair trial." He concluded the petitioners had had a fair trial, that the writ should be vacated "because not available to petitioners on the procedural history, and if so, the petitioners are not entitled

20 relies on, and the per curiam decision in Nos. 22 and 32 quotes, an earlier decision by that court based on an express assumption that if this Court had thought that the record showed a denial of constitutional rights, cer-

to discharge" since they did not substantiate their charges. *Daniels* v. *Crawford,* 99 F. Supp. 208, 213, 216. The Court of Appeals stated that it was only necessary to consider the proposition that petitioners were not entitled to the writ in view of the procedural history of the case and affirmed, saying that petitioners could not by habeas corpus circumvent the results of their failure to comply with the State procedural rules. Their allegation of peculiar hardship in only one day's default in complying with State procedural rules was before the Supreme Court in their application for certiorari "and, proper respect for that court requires that we assume that, if it had thought that such enforcement of the rules of court amounted to a denial of a fair hearing to men condemned to death, it would have granted certiorari either to the Supreme Court [of the State] or the trial court and would have reviewed the case. The case falls squarely, we think, within what was said by the Supreme Court in *Ex parte Hawk,* 321 U. S. 114, 118, . . . ." *Daniels* v. *Allen,* 192 F. 2d 763, 768, 769.

In No. 22, *Speller* v. *Allen,* the District Court stated that it "felt strongly disposed to deny the petition for writ of habeas corpus solely on the procedural history" but decided to hear evidence on the merits. After hearing evidence, the Court dismissed, "upon the procedural history and the record in the State Courts, for the reason that habeas corpus proceeding is not available to the petitioner for the purpose of raising the identical question passed upon in those Courts." Further, even if entitled to raise the same question, petitioner did not substantiate his claims. *Speller* v. *Crawford,* 99 F. Supp. 92, 95, 97. The Court of Appeals cited *Ex parte Hawk* and quoted from its opinion in *Stonebreaker* v. *Smyth,* 163 F. 2d 498, 499, to the same effect as the language in No. 20, that "proper respect" compels the conclusion that the Supreme Court would have granted certiorari had it thought petitioner's constitutional rights violated. *Speller* v. *Allen,* 192 F. 2d 477, 478.

In No. 32, *Brown* v. *Allen,* the District Court relied on *Stonebreaker* v. *Smyth* and denied the writ, noting that petitioner had apparently had a fair and impartial trial in the State courts and that the Supreme Court had refused to review the State court action. *Brown* v. *Crawford,* 98 F. Supp. 866. The Court of Appeals considered the case together with No. 22, and, as stated above, affirmed.

tiorari would have been granted. *Stonebreaker* v. *Smyth,* 163 F. 2d 498, 499.

If we were to sanction a rule directing the District Courts to give any effect to a denial of certiorari, let alone the effect of *res judicata* which is the practical result of the position of the Fourth Circuit, we would be ignoring actualities recognized ever since certiorari jurisdiction was conferred upon this Court more than sixty years ago.

From its inception certiorari jurisdiction has been treated for what it is in view of the function that it was devised to serve. It was designed to permit this Court to keep within manageable proportions, having due regard to the conditions indispensable for the wise adjudication of those cases which must be decided here, the business that is allowed to come before us. By successive measures Congress enlarged the discretionary jurisdiction of the Court until, by the Judiciary Act of 1925, supplemented by the Court's own invention of the jurisdictional statement in relation to the narrow scope of residual appeals, the Court became complete master of its docket. The governing consideration was authority in the Court to decline to review decisions which, right or wrong, do not present questions of sufficient gravity. Whatever the source of these questions, whether the common law, statutes or the Constitution, other cases of obvious gravity are more than enough to absorb the Court's time and thought. Cf. *Hamilton Shoe Co.* v. *Wolf Brothers,* 240 U. S. 251, 258.

It is within the experience of every member of this Court that we do not have to, and frequently do not, reach the merits of a case to decide that it is not of sufficient importance to warrant review here. Thirty years ago the Court rather sharply reminded the Bar not to draw strength for lower court opinions from the fact that they were left unreviewed here. "The denial of a writ of

certiorari imports no expression of opinion upon the merits of the case, as the bar has been told many times." *United States* v. *Carver*, 260 U. S. 482, 490. We have repeatedly indicated that a denial of certiorari means only that, for one reason or another which is seldom disclosed, and not infrequently for conflicting reasons which may have nothing to do with the merits and certainly may have nothing to do with any view of the merits taken by a majority of the Court, there were not four members of the Court who thought the case should be heard. Any departure from this fundamental rule in the type of case we are considering ought to be based on a showing that these denials of certiorari, unlike all the other denials, are in fact the essential equivalents of adjudication on the merits. The results of the inquiry detailed in the Appendix, *post*, p. 514, show that the contrary is the fact.[2] There is certainly no more assurance that these petitions have been canvassed on their merits than is true of cases within the ordinary domain of certiorari jurisdiction.

Indeed, there is less assurance that petitions by State prisoners could be considered on their merits than is the case with ordinary petitions for certiorari. To treat denials of certiorari in cases in which applications for habeas corpus are subsequently made in effect as adjudications here, presupposes, at the least, that such "determinations"

---

[2] An attempt to determine the factual context of a statistically representative group of habeas corpus applications is summarized in the Appendix, *post,* p. 514; the study there reported reflects the examination of the 126 Supreme Court files in cases in which certiorari was denied to State prisoners during the October 1950 Term and habeas corpus applications subsequently made in federal district courts, and examination of materials obtained in response to questionnaires sent to the District Clerks concerning the applications and the dispositions of those 126 cases in the District Courts.

are based on records of litigation in which issues are more or less carefully shaped by competent lawyers, as is after all true of the ordinary flow of certiorari cases. Such an assumption is shown to be wholly baseless by the study of the 126 certiorari files on which this opinion is based. It is also an assumption that falsifies the picture of the habeas corpus problems facing the District Judge.

These petitions for certiorari are rarely drawn by lawyers; some are almost unintelligible and certainly do not present a clear statement of issues necessary for our understanding, in view of the pressure of the Court's work.[3] The certified records we have in the run of certiorari cases to assist understanding are almost unknown in this field.[4] Indeed, the number of cases in which most of the papers necessary to prove what happened in the State proceedings are not filed is striking. Whether there has been an adjudication or simply a perfunctory denial of a claim below is rarely ascertainable. Seldom do we have enough on which to base a solid conclusion as to the adequacy of the State adjudication. Even if we are told something about a trial of the claims

---

[3] See Appendix, *post*, p. 516. As shown there, only 13 of 126 petitions were drawn by lawyers; others, of course, may have been drawn by lawyers either in or out of prison who did not choose to sign the petition. But our experience affirms the conclusion set forth in the survey based on one test of the legal adequacy of the petitions, that in a large number of cases, the petitions must be combed through to find the issues, certainly much more so than is true of the ordinary petitions for certiorari.

[4] See Appendix, *post*, pp. 516–517 and Table 1, *post*, pp. 518–519. The fact that we rarely do have sufficient papers may account for our disputes, even in the cases we grant, as to what has happened below. See, *e. g., Uveges* v. *Pennsylvania,* 335 U. S. 437. At the very least, we would want to have the petitions and the orders below, but even as to this minimum, as Table 1, Part 2 shows (Item "*a* and *c*"), in only 53 of the 114 cases in which the issues were raised after trial was this minimum available to us.

the applicant asserts, we almost never have a transcript of these proceedings to assist us in determining whether the trial was adequate.[5] Equally unsatisfactory as a means for evaluating the State proceedings is the filing of opinions; in less than one-fourth of the cases is more than a perfunctory order of the State courts filed.[6] We would have to have very different records and to alter our consideration of these cases radically if a denial could fairly be deemed to be an undisclosed decision on the merits. In a few cases the issues before the District Court had not even been raised here.[7] In other cases, the emphasis put on the issues here differed considerably from that put on them in the District Courts. Alice could understand, but not I, how under such circumstances a district judge could assume if he is so minded, that we "decided" the question now presented to him.

Just as there is no ground for holding that our denial is in effect *res judicata*, so equally is there no basis for leaving the District Judge free to decide whether we passed on the merits. For there is more to the story. The District Judge ordinarily knows painfully little of the painfully little we knew. It is a rare case indeed in which the District Court has any information concerning the certiorari proceeding. In over 90% of the cases studied, there were neither papers filed nor allegations made indicating in any way what issue the petition for certiorari presented.[8] In even fewer cases was there any indication that any papers from the State proceedings had been before this Court.[9] It may be said that the District Court

---

[5] See Appendix, Table 1, Part 2, *post*, p. 519.

[6] See Appendix, Table 1, Part 1, *post*, p. 518.

[7] See Appendix, *post*, pp. 525–526.

[8] See Appendix, Table 2, *post*, p. 523.

[9] See Appendix, Column 3 of Table 1, *post*, p. 518.

can call for the papers that were here. It is seldom done.[10] Moreover, in view of the unlikelihood that such a record could reveal enough for a sound judgment, such a requirement would be futile. But otherwise the District Judge can know only in a negligible number of cases what little we had before us. To say that he is at liberty to decide whether we passed on the merits of a case invites what must, in almost all cases, be idle speculation. We would be inviting a busy federal district judge to rest on our denial and cloak his failure to exercise a judgment in formal compliance with a statement that he can give meaning to something that almost always must to him be meaningless.

It is inadmissible to act as though these cases proceeded through the courts in an orderly fashion, leaving behind neat records which can be traced effectively with promise of enlightenment, once traced. Although it seems difficult to conceive of many cases in which a district judge, presented with a full record of the proceedings here, could give any relevant effect to the denial of certiorari, the likelihood is negligible that such a case will also be one of the very few in which he has enough materials to know what was before us. To give him discretion to interpret the denial of certiorari as a "determination" can so rarely be rationally justified that it is either futile or mischievous to allow such denial to weigh in the District Court's disposition.

In *Darr* v. *Burford* it was decided, as a matter of proper administration, that due regard for the relations between State and federal authority makes it undesirable in the ordinary case to permit an application to a federal dis-

---

[10] In 2 cases of the 126 studied, an order was entered in this Court returning original papers to the petitioner. Altogether, among the 329 applications for review of State denials of relief to State prisoners in the 1950 Term, 3 such orders were entered.

trict court on a claim which has already been presented to the State court before we have had an opportunity to review the State court action here. To hold, however, that a denial of certiorari may be deemed to be approval of the decision of the State court would be something far beyond fashioning a rule for the administration of judicial business. If district judges were authorized to deny an application for habeas corpus merely because the issues may have been considered by this Court in denying a petition for certiorari, the duty, which has been entrusted to the Federal Courts since the enlargement of the scope of habeas corpus jurisdiction by the Act of 1867, to deal judicially with applications for writs of habeas corpus by State convicts would be left to the unbounded, because undefined, discretion of the District Judges throughout the land. Judges dealing with the writ of habeas corpus, as with temporary injunctions, must be left some discretion—room for assessing fact and balancing conflicting considerations of public interest— if law is not to be a Procrustes bed. But discretion must be judicial discretion. It must be subject to rational criteria, by which particular situations may be adjudged. To allow applications for habeas corpus to be denied merely because it is deemed, on no reasonable or, at best, on the most fragile foundations, that the matter has already been adjudicated here, is to afford no criterion, but merely a shelter for district judges to respond according to the individual will.

We must not invite the exercise of judicial impressionism. Discretion there may be, but "methodized by analogy, disciplined by system." Cardozo, The Nature of the Judicial Process, 139, 141 (1921). Discretion without a criterion for its exercise is authorization of arbitrariness. The Nation's Supreme Court ought to be able to do better than to tell the Federal Judges of the land, in a field so vital as that of habeas corpus to vindicate con-

stitutional rights, that they may do as they please—that they are not to be bound, nor to be guided, by considerations capable of rational formulation.

This is not to impugn the conscientiousness of federal judges; if left at large in disposing of applications for a writ of habeas corpus, they would necessarily be thrown back upon their individual judgments, and that would be the exercise not of law but of arbitrariness.

The reasons why our denial of certiorari in the ordinary run of cases can be any number of things other than a decision on the merits are only multiplied by the circumstances of this class of petitions. And so we conclude that in habeas corpus cases, as in others, denial of certiorari cannot be interpreted as an "expression of opinion on the merits." *Sunal* v. *Large,* 332 U. S. 174, 181.

## II.

The issue of the significance of the denial of certiorari raises a sharp division in the Court. This is not so as to the bearing of the proceedings in the State courts upon the disposition of the application for a writ of habeas corpus in the Federal District Courts. This opinion is designed to make explicit and detailed matters that are also the concern of MR. JUSTICE REED's opinion. The uncommon circumstances in which a district court should entertain an application ought to be defined with greater particularity, as should be the criteria for determining when a hearing is proper. The views of the Court on these questions may thus be drawn from the two opinions jointly.

I deem it appropriate to begin by making explicit some basic considerations underlying the federal habeas corpus jurisdiction. Experience may be summoned to support the belief that most claims in these attempts to obtain review of State convictions are without merit. Presumably they are adequately dealt with in the State courts.

Again, no one can feel more strongly than I do that a casual, unrestricted opening of the doors of the federal courts to these claims not only would cast an undue burden upon those courts, but would also disregard our duty to support and not weaken the sturdy enforcement of their criminal laws by the States. That wholesale opening of State prison doors by federal courts is, however, not at all the real issue before us is best indicated by a survey recently prepared in the Administrative Office of the United States Courts for the Conference of Chief Justices: of all federal question applications for habeas corpus, some not even relating to State convictions, only 67 out of 3,702 applications were granted in the last seven years. And "only a small number" of these 67 applications resulted in release from prison: "a more detailed study over the last four years . . . shows that out of 29 petitions granted, there were only 5 petitioners who were released from state penitentiaries." [11] The meritorious claims are few, but our procedures must ensure that those few claims are not stifled by undiscriminating generalities. The complexities of our federalism and the workings of a scheme of government involving the interplay of two governments, one of which is subject to limitations enforceable by the other, are not to be escaped by simple, rigid rules which, by avoiding some abuses, generate others.

For surely it is an abuse to deal too casually and too lightly with rights guaranteed by the Federal Constitution, even though they involve limitations upon State power and may be invoked by those morally unworthy. Under the guise of fashioning a procedural rule, we are

[11] Habeas Corpus Cases in the Federal Courts Brought by State Prisoners, Administrative Office of the United States Courts 4 (Dec. 16, 1952). See also Appendix, *post*, pp. 526–527 and especially 526, n. 19, discussing the reluctance of the District Court to grant the one application out of the 126 there surveyed which was granted.

not justified in wiping out the practical efficacy of a jurisdiction conferred by Congress on the District Courts. Rules which in effect treat all these cases indiscriminately as frivolous do not fall far short of abolishing this head of jurisdiction.

Congress could have left the enforcement of federal constitutional rights governing the administration of criminal justice in the States exclusively to the State courts. These tribunals are under the same duty as the federal courts to respect rights under the United States Constitution. See The Federalist, No. 82; *Claflin* v. *Houseman,* 93 U. S. 130; *Testa* v. *Katt,* 330 U. S. 386; Note, 60 Harv. L. Rev. 966. Indeed, the jurisdiction given to the federal courts to issue writs of habeas corpus by the First Judiciary Act, § 14, 1 Stat. 81–82, extended only to prisoners in custody under authority of the United States. It was not until the Act of 1867 that the power to issue the writ was extended to an applicant under sentence of a State court. It is not for us to determine whether this power should have been vested in the federal courts. As Mr. Justice Bradley, with his usual acuteness, commented not long after the passage of that Act, "although it may appear unseemly that a prisoner, after conviction in a state court, should be set at liberty by a single judge on *habeas corpus,* there seems to be no escape from the law." *Ex parte Bridges,* 2 Woods (5th Cir.) 428, 432. His feeling has been recently echoed in a proposal of the Judicial Conference of Senior Circuit Judges that these cases be heard by three-judge courts.[12] See

---

[12] The proposal has now been abandoned. See Rep. Jud. Conf., 1947, p. 17. A suggestion of Mr. Justice Bradley on the subject, *Ex parte Bridges, loc. cit. supra,* is reflected in the proposal of the Conference of the Chief Justices of the States that the final judgment of a State's highest court in a criminal proceeding "be subject to review or reversal only by the Supreme Court of the United States." 25 State Government 249–250 (November 1952).

Rep. Jud. Conf. 1943, p. 23. But the wisdom of such a modification in the law is for Congress to consider, particularly in view of the effect of the expanding concept of due process upon enforcement by the States of their criminal laws. It is for this Court to give fair effect to the habeas corpus jurisdiction as enacted by Congress. By giving the federal courts that jurisdiction, Congress has imbedded into federal legislation the historic function of habeas corpus adapted to reaching an enlarged area of claims. See, *e. g., Mooney* v. *Holohan,* 294 U. S. 103; *Johnson* v. *Zerbst,* 304 U. S. 458.

In exercising the power thus bestowed, the District Judge must take due account of the proceedings that are challenged by the application for a writ. All that has gone before is not to be ignored as irrelevant. But the prior State determination of a claim under the United States Constitution cannot foreclose consideration of such a claim, else the State court would have the final say which the Congress, by the Act of 1867, provided it should not have. Cf. *Ex parte Royall,* 117 U. S. 241, 248–250. A State determination may help to define the claim urged in the application for the writ and may bear on the seriousness of the claim. That most claims are frivolous has an important bearing upon the procedure to be followed by a district judge. The prior State determination may guide his discretion in deciding upon the appropriate course to be followed in disposing of the application before him. The State record may serve to indicate the necessity of further pleadings or of a quick hearing to clear up an ambiguity, or the State record may show the claim to be frivolous or not within the competence of a federal court because solely dependent on State law.

It may be a matter of phrasing whether we say that the District Judge summarily denies an application for a writ by accepting the ruling of the State court or by making an independent judgment, though he does so on

the basis of what the State record reveals. But since phrasing mirrors thought, it is important that the phrasing not obscure the true issue before a federal court. Our problem arises because Congress has told the District Judge to act on those occasions, however rare, when there are meritorious causes in which habeas corpus is the ultimate and only relief and designed to be such. Vague, undefined directions permitting the District Court to give "consideration" to a prior State determination fall short of appropriate guidance for bringing to the surface the meritorious case. They may serve indiscriminately to preclude a hearing where one should have been granted, and yet this basis for denial may be so woven into the texture of the result that an improper deference to a State court treatment of a constitutional issue cannot even be corrected on review. If we are to give effect to the statute and at the same time avoid improper intrusion into the State criminal process by federal judges— and there is no basis for thinking there is such intrusion unless "men think dramatically, not quantitatively," Holmes, Collected Legal Papers, p. 293—we must direct them to probe the federal question while drawing on available records of prior proceedings to guide them in doing so.

Of course, experience cautions that the very nature and function of the writ of habeas corpus precludes the formulation of fool-proof standards which the 225 District Judges can automatically apply. Here as elsewhere in matters of judicial administration we must attribute to them the good sense and sturdiness appropriate for men who wield the power of a federal judge. Certainly we will not get these qualities if we fashion rules assuming the contrary. But it is important, in order to preclude individualized enforcement of the Constitution in different parts of the Nation, to lay down as specifically as the nature of the problem permits the standards or directions

that should govern the District Judges in the disposition of applications for habeas corpus by prisoners under sentence of State courts.

*First.* Just as in all other litigation, a prima facie case must be made out by the petitioner. The application should be dismissed when it fails to state a federal question, or fails to set forth facts which, if accepted at face value, would entitle the applicant to relief.

Care will naturally be taken that the frequent lack of technical competence of prisoners should not strangle consideration of a valid constitutional claim that is bunglingly presented. District judges have resorted to various procedures to that end. Thus, a lawyer may be appointed, in the exercise of the inherent authority of the District Court (cf., *e. g., Ex parte Peterson,* 253 U. S. 300), either as an *amicus* or as counsel for the petitioner, to examine the claim and to report, or the judge may dismiss the petition without prejudice.[13]

*Second.* Failure to exhaust an available State remedy is an obvious ground for denying the application. An attempt must have been made in the State court to present the claim now asserted in the District Court, in compliance with § 2254 of the Judicial Code. Section 2254 does not, however, require repeated attempts to invoke the same remedy nor more than one attempt where there are alternative remedies. Further, *Darr* v. *Burford* requires "ordinarily" an application for certiorari to the United States Supreme Court from the State's denial of relief. Cf. *Frisbie* v. *Collins,* 342 U. S. 519, 520–522.

---

[13] The Appendix shows a wide variety of procedures used to accommodate judicial proceedings to the needs of petitioners ill-equipped to state whatever claims they may have. See Appendix, Table 4, *post,* p. 528, and *post,* p. 527. By any standard, the applications for habeas corpus are very often woefully inadequate to apprise the judge of the claim. See Appendix, *post,* pp. 522–523.

Of course, nothing we have said suggests that the federal habeas corpus jurisdiction can displace a State's procedural rule requiring that certain errors be raised on appeal. Normally rights under the Federal Constitution may be waived at the trial, *Adams* v. *United States ex rel. McCann,* 317 U. S. 269, and may likewise be waived by failure to assert such errors on appeal. Compare *Frank* v. *Mangum,* 237 U. S. 309, 343. When a State insists that a defendant be held to his choice of trial strategy and not be allowed to try a different tack on State habeas corpus, he may be deemed to have waived his claim and thus have no right to assert on federal habeas corpus. Such considerations of orderly appellate procedure give rise to the conventional statement that habeas corpus should not do service for an appeal. See *Adams* v. *United States ex rel. McCann, supra,* at 274. Compare *Sunal* v. *Large,* 332 U. S. 174, with *Johnson* v. *Zerbst,* 304 U. S. 458, 465–469. However, this does not touch one of those extraordinary cases in which a substantial claim goes to the very foundation of a proceeding, as in *Moore* v. *Dempsey,* 261 U. S. 86. Cf. *Ex parte Lange,* 18 Wall. 163; *Ex parte Royall,* 117 U. S. 241.

*Third.* If the record of the State proceedings is not filed, the judge is required to decide, with due regard to efficiency in judicial administration, whether it is more desirable to call for the record or to hold a hearing. Ordinarily, where the issues are complex, it will be simpler to call for the record, certainly in the first instance. If the issues are simple, or if the record is called for and is found inadequate to show how the State court decided the relevant historical facts, the District Court shall use appropriate procedures, including a hearing if necessary, to decide the issues.

Such flexibility in the inquiry into the facts is necessary. A printed record reflecting orderly procedure through the State courts and showing clearly what has

happened in the State courts is rarely available in these cases.[14]  The effort and expense of calling for a record and of having a transcript of the proceedings prepared might be more burdensome than a short hearing, especially where the questions of fact are simple and easily settled. It seems an unnecessary deference to State proceedings to say that the District Judge, regardless of the relative expense of one procedure or the other, must always call for everything in the State proceedings.  To satisfy requirements of exhaustion he will want to know enough to know whether the claim presented to him was presented in the State courts.  But if the claim is either frivolous or, at the other extreme, substantial and if the facts are undisputed, to call for the State record would probably avail little.  If the claim is frivolous, the judge should deny the application without more.  If the question is one on which he must exercise his legal judgment under the habeas corpus statute,[15] it may be sufficient to have information, perhaps presented by the pleadings of the applicant or of the State, as to the disposition of any disputed questions of fact.  It seems unduly rigid to require the District Judge to call for the State record in every case.

Moreover, the kinds of State adjudications differ.  In some cases the State court has held a hearing and rendered a decision based on specific findings of fact; there may have been review by a higher State court which had before it the pleadings, the testimony, opinions and briefs on appeal.  It certainly would make only for burdensome and useless repetition of effort if the federal courts were to rehear the facts in such cases.  At the other pole is the perfunctory memorandum order denying a badly drawn petition and stating simply that the petitioner is not en-

---

[14] See Appendix, Table 1, *post,* pp. 518–519.

[15] See pp. 500–501, *supra,* and pp. 507–508, *post.*

titled to relief. The District Judge cannot give the same weight to this sort of adjudication as he does to the first; he has no basis for exercising the judgment the statute requires him to exercise.

These criteria for determining when it is proper to hold a hearing seem to me appropriate in relating the habeas corpus provisions to the realities of these cases. Section 2241 empowers the District Courts to grant writs of habeas corpus to prisoners in custody in violation of the Federal Constitution. Section 2243 commands the judge "entertaining" an application to award the writ or issue an order to show cause "unless it appears from the application that the applicant . . . is not entitled thereto." It seems clear enough that the word "entertain" does not refer to holding a hearing, and MR. JUSTICE REED's suggestion that it refers to the District Court's conclusion that a hearing is "proper," [16] is unsatisfying.[17] The proviso that no writ or order need be issued if the application shows that the applicant is not entitled thereto certainly permits "entertaining" and nevertheless summarily dismissing for failure to state a claim, failure to exhaust State remedies, or proof from the papers themselves, including the record of the State proceedings, if filed, that there is no claim. At the same time, the command that the writ or an order be issued in some cases hardly requires a hearing in every such case. As in any litigation, the pleadings may show, either separately or taken together, that there is no claim. It can hardly be contended that by "entertaining" the application to the extent of issuing the writ or an order, the

---

[16] Opinion of MR. JUSTICE REED, supra, p. 461.

[17] MR. JUSTICE REED's citation of *Walker* v. *Johnston*, 312 U. S. 275, to indicate what might be a "proper" case in which to hold a hearing is puzzling, for that case requires, in habeas corpus actions by federal prisoners, that a hearing be held if the application and the answer or return to the writ raise a question of fact.

District Judge commits himself to holding a hearing, if the return to the writ or the order to show cause shows unquestionably that the applicant is not entitled to discharge.[18]

*Fourth.* When the record of the State court proceedings is before the court, it may appear that the issue turns on basic facts and that the facts (in the sense of a recital of external events and the credibility of their narrators) have been tried and adjudicated against the applicant. Unless a vital flaw be found in the process of ascertaining such facts in the State court, the District Judge may accept their determination in the State proceeding and deny the application. On the other hand, State adjudication of questions of law cannot, under the habeas corpus statute, be accepted as binding. It is precisely these questions that the federal judge is commanded to decide.[19]

A State determination of the historical facts, the external events that occurred, may have been made after hearing witnesses perhaps no longer available or whose recollection later may have been affected by the passage of time or by the fact that one judicial determination has already been made. To be sure, these considerations argue equally against hearing the claims at all long after the facts took place. But Congress, by making habeas corpus available, has determined that other considerations prevail. We are left to devise appropriate rules, and the congressional determination does not preclude rules recognizing the soundness of giving great weight to testimony earlier heard, just as it does not undermine the principle

---

[18] The language of § 2243, "When the writ or order is returned a day shall be set for hearing . . .," hardly requires a hearing in every case in which a writ is issued. Just as the District Judge may deny an application without a hearing if the return shows that applicant failed to exhaust the State remedy—as he certainly may do—so may he dispose of the case without a hearing if the return conclusively shows applicant's failure to state a claim.

[19] See pp. 507–508, *post.*

that the burden of proving facts inconsistent with judicial records in all proceedings of this kind is heavy.

*Fifth.* Where the ascertainment of the historical facts does not dispose of the claim but calls for interpretation of the legal significance of such facts, see *Baumgartner* v. *United States,* 322 U. S. 665, 670–671, the District Judge must exercise his own judgment on this blend of facts and their legal values. Thus, so-called mixed questions or the application of constitutional principles to the facts as found leave the duty of adjudication with the federal judge.

For instance, the question whether established primary facts underlying a confession prove that the confession was coerced or voluntary cannot rest on the State decision. See, *e. g., Haley* v. *Ohio,* 332 U. S. 596, 601 (concurring opinion) and *Stroble* v. *California,* 343 U. S. 181, 190. Again, *Powell* v. *Alabama,* 287 U. S. 45, represents the settled rule that due process requires a State court in capital cases to assign counsel to the accused. Consequently, a finding in a State court of the historical fact that the accused had not had counsel could be considered binding by the District Judge, who would issue the writ regardless of what conclusion the State court had reached as to the law on representation by counsel in capital cases. If the conviction was not for a capital offense, however, *Powell* v. *Alabama* may not apply, and the considerations adverted to in that opinion as to the necessity of counsel in a particular case to ensure fundamental fairness would be controlling. The District Judge would then look to the State proceedings for whatever light they shed on the historical facts such as the age and intelligence of the accused, his familiarity with legal proceedings, and the kind of issues against which he had to defend himself. Cf. *Johnson* v. *Zerbst,* 304 U. S. 458. But it is for the federal judge to assess on the basis of such historical facts the fundamental fairness

of a conviction without counsel in the circumstances. Although there is no need for the federal judge, if he could, to shut his eyes to the State consideration of such issues, no binding weight is to be attached to the State determination. The congressional requirement is greater. The State court cannot have the last say when it, though on fair consideration and what procedurally may be deemed fairness, may have misconceived a federal constitutional right.

*Sixth.* A federal district judge may under § 2244 take into consideration a prior denial of relief by a federal court, and in that sense § 2244 is of course applicable to State prisoners. Section 2244 merely gave statutory form to the practice established by *Salinger* v. *Loisel,* 265 U. S. 224. What was there decided and what § 2244 now authorizes is that a federal judge, although he may, need not inquire anew into a prior denial of a habeas corpus application in a federal court if "the petition presents no new ground not theretofore presented and determined, and the judge or court is satisfied that the ends of justice will not be served by such inquiry."

These standards, addressed as they are to the practical situation facing the District Judge, recognize the discretion of judges to give weight to whatever may be relevant in the State proceedings, and yet preserve the full implication of the requirement of Congress that the District Judge decide constitutional questions presented by a State prisoner even after his claims have been carefully considered by the State courts. Congress has the power to distribute among the courts of the States and of the United States jurisdiction to determine federal claims. It has seen fit to give this Court power to review errors of federal law in State determinations, and in addition to give to the lower federal courts power to inquire into federal claims,

by way of habeas corpus. Such power is in the spirit of our inherited law. It accords with, and is thoroughly regardful of, "the liberty of the subject," from which flows the right in England to go from judge to judge, any one of whose decisions to discharge the prisoner is final.[20] Our rule is not so extreme as in England; § 2244 does place some limits on repeating applications to the Federal Courts. But it would be in disregard of what Congress

---

[20] See *Secretary of State for Home Affairs* v. *O'Brien,* [1923] A. C. 603, 610, where the House of Lords ruled that despite the fact that "in terms the words [of § 3 of the Appellate Jurisdiction Act of 1876, 39 & 40 Vict. 380] are wide enough to give an appeal in such a matter as the present," the House of Lords has no jurisdiction to hear an appeal in a habeas corpus case that went in favor of "the liberty of the subject." It is worth noting that by this decision the House of Lords applied and extended an earlier decision of the House of Lords (*Cox* v. *Hakes,* 15 A. C. 506 (1890)) in which so powerful a group of judges as Lord Halsbury L. C. and Lords Watson, Bramwell, Herschell and Macnaghten joined. The tenor of that decision is sufficiently indicated by the quotations that follow. Lord Halsbury wrote:

"In days of technical pleading no informality was allowed to prevent the substantial question of the right of the subject to his liberty being heard and determined. The right to an instant determination as to the lawfulness of an existing imprisonment, and the twofold quality of such a determination that, if favourable to liberty it was without appeal, and if unfavourable it might be renewed until each jurisdiction had in turn been exhausted, have from time to time been pointed out by Judges as securing in a marked and exceptional manner the personal freedom of the subject. It was not a proceeding in a suit but was a summary application by the person detained." 15 A. C., at 514–515.

And this is from the judgment of Lord Herschell:

"No Court was bound by the view taken by any other, or felt itself obliged to follow the law laid down by it. Each Court exercised its independent judgment upon the case, and determined for itself whether the return to the writ established that the detention of the applicant was in accordance with the law. A person detained

has expressly required to deny State prisoners access to the federal courts.

The reliable figures of the Administrative Office of the United States Courts, *supra*, p. 498, showing that during the last four years five State prisoners, all told, were discharged by federal district courts, prove beyond peradventure that it is a baseless fear, a bogeyman, to worry lest State convictions be upset by allowing district courts to entertain applications for habeas corpus on behalf of prisoners under State sentence. Insofar as this jurisdiction enables federal district courts to entertain claims that State Supreme Courts have denied rights guaranteed by the United States Constitution, it is not a case of a lower court sitting in judgment on a higher court. It is merely one aspect of respecting the Supremacy Clause of the Constitution whereby federal law is higher than State law. It is for the Congress to designate the member in the hierarchy of the federal judiciary to express the higher law. The fact that Congress has authorized district courts to be the organ of the higher law rather than a Court of Appeals, or exclusively this Court, does not mean that it allows a lower court to overrule a higher court. It merely expresses the choice of Congress how the superior authority of federal law should be asserted.

I yield to no member of this Court in awareness of the enormity of the difficulties of dealing with crime that is the concomitant of our industrialized society. And I am deeply mindful of the fact that the responsibility for this task largely rests with the States. I would not for a

---

in custody might thus proceed from court to court until he obtained his liberty. . . . I need not dwell upon the security which was thus afforded against any unlawful imprisonment. It is sufficient to say that no person could be detained in custody if any one of the tribunals having power to issue the writ of habeas corpus was of opinion that the custody was unlawful." *Id.*, at 527–528.

moment hamper them in the effective discharge of this responsibility. Equally am I aware that misuse of legal procedures, whereby the administration of criminal justice is too often rendered leaden-footed, is one of the disturbing features about American criminal justice. On the other hand, it must not be lost sight of that there are also abuses by the law-enforcing agencies. It does not lessen the mischief that it is due more often to lack of professional competence and want of an austere employment of the awful processes of criminal justice than to wilful misconduct. In this connection it is relevant to quote the observations of one of the most esteemed of Attorneys General of the United States, William D. Mitchell:

> "Detection and punishment of crime must be effected by strictly lawful methods. Nothing has a greater tendency to beget lawlessness than lawless methods of law enforcement. The greater the difficulties of detecting and punishing crime, the greater the temptation to place a strained construction on statutes to supply what may be thought to be more efficient means of enforcing law. The statutory and constitutional rights of all persons must be regarded, and their violation, inadvertent or otherwise, is to be avoided." (Department of Justice release, for April 8, 1929.)

Unfortunately, instances are not wanting in which even the highest State courts have failed to recognize violations of these precepts that offend the limitations which the Constitution of the United States places upon enforcement by the States of their criminal law. See, *e. g., De Meerleer* v. *Michigan,* 329 U. S. 663, and *Marino* v. *Ragen,* 332 U. S. 561. Can it really be denied that in both these cases, which antedated *Darr* v. *Burford,* the

United States District Courts sitting in Illinois and Michigan would have been justified in granting the writ of habeas corpus had application been made for it? The tag that an inferior court should not override a superior court would not have been a fit objection against the exercise of the jurisdiction with which the Congress invested the District Courts.

The uniqueness of habeas corpus in the procedural armory of our law cannot be too often emphasized. It differs from all other remedies in that it is available to bring into question the legality of a person's restraint and to require justification for such detention. Of course this does not mean that prison doors may readily be opened. It does mean that explanation may be exacted why they should remain closed. It is not the boasting of empty rhetoric that has treated the writ of habeas corpus as the basic safeguard of freedom in the Anglo-American world. "The great writ of *habeas corpus* has been for centuries esteemed the best and only sufficient defence of personal freedom." Mr. Chief Justice Chase, writing for the Court, in *Ex parte Yerger,* 8 Wall. 85, 95. Its history and function in our legal system and the unavailability of the writ in totalitarian societies are naturally enough regarded as one of the decisively differentiating factors between our democracy and totalitarian governments.

The significance of the writ for the moral health of our kind of society has been amply attested by all the great commentators, historians and jurists, on our institutions. It has appropriately been characterized by Hallam as "the principal bulwark of English liberty." But the writ has potentialities for evil as well as for good. Abuse of the writ may undermine the orderly administration of justice and therefore weaken the forces of authority that are essential for civilization.

The circumstances and conditions for bringing into action a legal remedy having such potentialities obviously

cannot be defined with a particularity appropriate to legal remedies of much more limited scope. To attempt rigid rules would either give spuriously concrete form to wide-ranging purposes or betray the purposes by strangulating rigidities. Equally unmindful, however, of the purposes of the writ—its history and its functions—would it be to advise the Federal District Courts as to their duty in regard to habeas corpus in terms so ambiguous as in effect to leave their individual judgment unguided. This would leave them free to misuse the writ by being either too lax or too rigid in its employment. The fact that we cannot formulate rules that are absolute or of a definiteness almost mechanically applicable does not discharge us from the duty of trying to be as accurate and specific as the nature of the subject permits.

It is inadmissible to deny the use of the writ merely because a State court has passed on a federal constitutional issue. The discretion of the lower courts must be canalized within banks of standards governing all federal judges alike, so as to mean essentially the same thing to all and to leave only the margin of freedom of movement inevitably entailed by the nature of habeas corpus and the indefinable variety of circumstances which bring it into play.

Mr. Justice Black and Mr. Justice Douglas.

We agree with Mr. Justice Frankfurter that our previous denial of certiorari in a case should be given no legal significance when an application for a writ of habeas corpus in that case comes before a Federal District Court. We also agree in substance with the views expressed in Part II of his opinion concerning the bearing of the proceedings in the State courts upon the disposition of an application for a writ of habeas corpus in the Federal District Court.

514

With a view to formulating wise procedures for the exercise of federal habeas corpus jurisdiction on applications by State prisoners, a study was made of all federal district court applications for habeas corpus by prisoners serving sentences in State prisons whose prior applications for certiorari to the United States Supreme Court from State court proceedings had been denied during the October 1950 Term.[1] That Term, the first following the decision in *Darr* v. *Burford,* was chosen because of the greater likelihood that habeas corpus actions initiated in the District Courts following a denial of certiorari in that Term would be terminated than would be true of cases in which certiorari had been denied last Term. The petitions for certiorari in the October 1950 Term and the number of subsequent applications for habeas corpus can fairly be said to be typical.

A list of all such petitions for certiorari was compared with lists of all habeas corpus applications in the Federal District Courts from October, 1950, until May, 1952.[2] As a result, 126 different petitioners [3] whose petitions for

---

[1] Included were cases filed earlier but continued into the October 1950 Term; cases filed in the October 1950 Term but continued into later terms were excluded.

[2] In all this work we have had the ready cooperation of the Administrative Office of the United States Courts, more particularly with Will Shafroth, Esq., Orin S. Thiel, Esq., and Joseph F. Spaniol, Jr., Esq., and of the Clerks of the United States District Courts. Nor should the important share that Donald T. Trautman, Esq., had in carrying out this study go unmentioned.

[3] Excluding eight petitioners who were codefendants with other petitioners and who presented the same issues as those other petitioners. In all, 134 petitioners appeared again in the District Courts, but in only 126 separate cases. The words "case" and "petitioner" will both be used in reference to the 126 cases; when "petitioner" or "applicant" is used, it should be read as one or more prisoners presenting the same claim arising out of the same trial. For clarity, the

certiorari or other comparable relief [4] from State decisions were denied here were found to have brought subsequent proceedings [5] in the Federal District Courts. Thereupon, a questionnaire was sent out concerning each habeas corpus application, and the answers to those questionnaires, together with a study of Supreme Court files, form the basis for the survey.

The data are here set out in chronological sequence and not arranged with relation to the issues they affect. The information concerning the Supreme Court proceedings is set out first, in Part I, and in Part II that concerning the actions in the District Courts.

---

prisoners will be referred to as "petitioners" for certiorari in the Supreme Court and "applicants" for habeas corpus in the District Courts.

[4] Cases in which petitioners in the Supreme Court sought original habeas corpus or mandamus or other relief have been included in this study, unless federal district court relief had already been invoked so that the habeas corpus application could not be interpreted as reviewing a State court determination. Petitions for certiorari or applications for other relief in the Supreme Court were not included if dismissed on motion of the petitioners.

[5] In cases where two or more petitions for certiorari were made by a single petitioner during the October 1950 Term, that case was analyzed which presented the issue or the course of proceedings later presented in the District Court. Where several applications for habeas corpus have been made in the District Courts, that application nearest in time to the denial of certiorari was used, unless (a) the first application was rejected for formal defects, such as failure to allege exhaustion of State remedies or failure to set out clearly the course of the proceedings, and the second application corrected those defects; or (b) the second (or a later) application, unlike the first, presented the issue or the course of proceedings which the Supreme Court was asked to review. In a few instances, the proceedings are so tangled that it was impossible to apply these criteria; thus, although ordinarily a case was excluded if State relief was sought after the denial of certiorari but before the application in the Federal District Court for habeas corpus, occasionally such a case was included if the issue or course of proceedings was the same in the District Court as in the Supreme Court.

## I. Papers and Disposition in Supreme Court.[6]

### A. *The Petitions for Certiorari.*[7]

In 97 of the 126 cases only the original of the petition was filed; in the other 29 cases, at least one copy of the petition was filed, but in only two cases were there the minimum nine copies required of the ordinary petitions for certiorari. One-half of the petitions contained nine pages or less.

Of the 126 petitions, 13 were signed by lawyers. In a classification of the other petitions according to the degree of familiarity with law shown by the petitioners, 53 petitions were found not even to meet a generous standard requiring only that the petitioner intelligibly allege some facts and make some minimum attempt to connect those facts to a legal principle, whether or not the principle was valid or even arguable.

### B. *Papers Filed in Support of the Petition for Certiorari.*

Four of the petitioners whose papers are still on file here[8] submitted over 300 pages of papers in support of the petition for certiorari. The other 120 petitioners filed an average of under 30 pages of supporting papers per case.

Full records, though in two cases not in due form, were filed by the petitioners in eight cases, while excerpts from the records both of the trial proceedings and of the State proceedings in which petitioner assailed the valid-

---

[6] Every file in the 126 cases surveyed was studied; the data in the following sections are those revealed by the files. It occasionally occurred that particular data were unavailable. For that reason, wherever tables are presented, the total number of cases for which the data were available is indicated at the top of the table.

[7] See footnote 3 above.

[8] In two cases, at least some of the Supreme Court papers were returned to the petitioner.

ity of the trial proceedings were filed in another 51 cases, as is shown in Table 1. No papers from the record below were filed in 24 of 125 cases. Among the excerpts from the records filed, in 26 cases a State court opinion [9] was filed from some proceeding in which the same issues were presented. There was no citation to, or filing of, an opinion or memorandum order in 46 of the cases. The first column of Table 1 [10] shows in detail what papers from the records below were filed in the Supreme Court.

---

[9] As there is no bright line between orders and opinions, any order containing more than a perfunctory statement in general terms that the relief sought was denied is classified as an opinion.

[10] The table does not purport to show all the papers filed in the Supreme Court, but only those filed by the petitioner, because such figures give a better index of the lack of technical competence of the petitioners and their inability, often, because of prison confinement, to prepare all the papers. At p. 521, *post,* the insubstantial change effected in these figures by the responses filed by the State is discussed.

The terms "trial proceedings" or "trial" are used to denote both the trial in which petitioner was convicted and direct appeal from the conviction. The terms "attacking proceedings" or "attack" include all actions such as habeas corpus, coram nobis, and other post-conviction remedies in the State courts to obtain relief from an invalid conviction. Delayed motions for new trial have been treated for purposes of these tables as attacking proceedings.

"Orders or Opinions" in Part 2 of the table includes, as to the trial proceedings, the judgment of conviction, the sentence or other conviction papers, as well as, for example, an order or opinion on direct appeal. As to trial and attacking proceedings, even the perfunctory order discussed in footnote 9 was included.

"Transcript of proceedings" or "Transcript" is used to denote a stenographic report of the testimony or hearings. Adequate excerpts from such transcripts are included.

"Motions or Petitions" is used to denote any pleadings by either party.

In 11 cases, there were no attacking proceedings. Hence the total number of Supreme Court cases in Part 2 of Table 1 is 114 rather than 125.

Table 1. Papers filed in Supreme Court and comparison with papers filed in District Court *

Part 1

| | NUMBER OF CASES IN SUPREME COURT | | NUMBER OF CASES IN DISTRICT COURT * | | DATA ALLEGED TO BE IN SUPREME COURT * | |
|---|---|---|---|---|---|---|
| **I. *Filing of Record Below.*** | | | | | | |
| Total Cases for which data available | 125 | 100.0% | 123 | 100.0% | 122 | 100% |
| No part of Record Below filed | 24 | 19.2 | 35 | 28.5 | 115 | 94.3 |
| Record Below or Excerpts filed | 101 | 80.8 | 88 | 71.5 | 7 | 5.7 |
| Full Record | 8 | | 6 | | 0 | |
| Excerpts from both trial and attack * | 46 | | 42 | | 3 | |
| Excerpts from trial where no attack | 5 | 59 | 3 | 51 | 0 | 3 |
| Excerpts from attack only | 36 | | 20 | | 4 | |
| Excerpts from trial only | 6 | | 17 | | 0 | |
| **II. *Filing of Opinion or Order Below.*** | | | | | | |
| Total Cases for which data available | 126 | | 122 | | 122 | |
| Opinion Below filed | 26 | | 16 | | 3 | |
| Opinion Below cited | 3 | | 4 | | 0 | |
| Excerpts from Opinion Below filed | 1 | 30 | 1 | 21 | 0 | 3 |
| Order Below, filed or quoted | 50 | | 26 | | 2 | |
| Mere reference or less to Order Below | 46 | | 75 | | 3 | |
| Nothing alleged to show District Court what was before the Supreme Court | — | | — | | 114 | |

* See footnote 10, *supra,* for explanation of the terms used in the table. The statistics in the second and third columns are discussed at p. 522 *et seq., post.*

TABLE 1. PAPERS FILED IN DISTRICT COURT AND COMPARISON WITH PAPERS FILED IN SUPREME COURT—continued

Part 2

| | NUMBER OF CASES IN SUPREME COURT | | NUMBER OF CASES IN DISTRICT COURT | | DATA ALLEGED TO BE IN SUPREME COURT | |
|---|---|---|---|---|---|---|
| | TRIAL* | ATTACK* | TRIAL | ATTACK | TRIAL | ATTACK |
| III. *Pleadings, Orders, and Transcripts.* Total Cases for which data available | 125 | 114 | 123 | 112 | 122 | 111 |
| *a.* Orders or Opinions* | 52 | 71 | 47 | 37 | 2 | 4 |
| *b.* Transcript of Proceedings* | 18 | 4 | 14 | 3 | 1 | 1 |
| *c.* Motions or Petitions* | 12 | 67 | 5 | 34 | 0 | 3 |
| IV. *Pleadings, Orders, and Transcripts by Cases.* Total Cases for which data available | 125 | 114 | 123 | 112 | 122 | 111 |
| *a, b* and *c* above | 7 | 3 | 4 | 2 | 0 | 0 |
| *a* only | 40 | 14 | 39 | 18 | 2 | 2 |
| *b* only | 7 | 0 | 7 | 1 | 1 | 1 |
| *c* only | 2 | 11 | 0 | 15 | 0 | 1 |
| *a* and *b* | 3 | 1 | 3 | 0 | 0 | 0 |
| *a* and *c* | 2 | 53 | 1 | 17 | 0 | 2 |
| *b* and *c* | 1 | 0 | 0 | 0 | 0 | 0 |
| Total, Some of Above Papers Filed | 62 (49.6%) | 82 (72.0%) | 54 (43.9%) | 53 (47.3%) | 3 (2.5%) | 6 (5.4%) |

*See footnote 10, *supra*, for explanation of the terms used in the table.

C. *Issues Presented.*

The issues raised by the petitioners varied from substantial federal claims to questions purely of State law. In a sorting of the petitions according to the claim that seemed the principal or most substantial one, two or three claims were found to have been most often asserted as the principal claim: the inadequacy of counsel or representation by counsel not of petitioner's choosing was claimed as the principal issue in 14 cases; in another 14, the sentences imposed were attacked as illegal, excessive or discriminatory; in 10 cases, a claim was made that the prosecuting attorney knowingly used perjured evidence or suppressed evidence. In general, errors in the preliminary proceedings were asserted as the main claim in 8 cases, errors in the indictment or information in 7, errors affecting the pleas in 14, concerning representation by counsel in 31, affecting the trial including inadmissibility of evidence, prejudice, and delay in 41, and errors surrounding the sentence in 17. Miscellaneous claims such as denials of a right to appeal or to a post-trial hearing and defects in extradition proceedings totaled 8.

Perhaps of most significance to the central problem here was the discrepancy between the claims made in the Supreme Court and those made in the District Courts. This comparison will be made in Part II, dealing with the issues presented in the District Courts.[11]

D. *Responses Filed by the States, and Final Disposition in the Supreme Court.*

Table 1, *supra,* shows what papers were filed by the petitioners and not necessarily all the papers before the Court. In 15 of the 126 cases, the Supreme Court, either because of the seriousness of the allegations or the inadequacy of the record as presented by the petitioner, called for a response by the State. Fourteen responses were filed in accordance with these requests. In addition,

---

[11] See pp. 525–526, *post.*

the docket of the Supreme Court shows that responses were filed by the State in another 7 cases. In 10 of the 21 responses in these cases, additional parts of the record not already filed by the petitioners thus came before the Court, but the additions do not substantially change the picture presented in Table 1. For example, Table 1, Part 1, shows that in 30 cases, the petitioner filed in the Supreme Court the opinion below or excerpts or cited the opinion; the States filed the opinion below with their responses in an additional 4 cases. Like modifications, in no instance exceeding 5 cases, would be made in other of the items in Table 1 if it included papers filed by the State.

The disposition of these cases in the Supreme Court is in marked contrast with the disposition of ordinary petitions for certiorari. Petitions for certiorari by State prisoners from State denials of relief and miscellaneous applications to this Court are almost always filed *in forma pauperis* and constitute about 60% of all petitions *in forma pauperis*. Since, as this study indicates, they are only rarely filed by lawyers and seldom accompanied by adequate records, the decision whether to entertain these cases is necessarily made upon less information and with greater dispatch than with ordinary petitions for certiorari. A rough index to the disposition of these cases as compared with ordinary petitions for certiorari is afforded by published figures showing the proportion of petitions granted. While 15.2% of the ordinary petitions for certiorari are granted, only 4.2% of the *in forma* petitions and no miscellaneous applications were granted during the 1950 Term.[12]

On an assumption that the certiorari jurisdiction of the Supreme Court ordinarily is not to be exercised merely

---

[12] See Report of the Judicial Conference of the United States 1951— Annual Report of the Director of the Administrative Office of the United States Courts 1951, 78.

because a decision below may be wrong, an attempt was made to indicate in terms of considerations affecting the certiorari jurisdiction the sort of question presented.[13] Questions purely of State law seemed to be the chief claim of 30 petitions. Questions probably not of sufficient general importance to warrant the exercise of the certiorari jurisdiction seemed the chief claims in another 61 cases, 44 because the issue was one primarily of fact and 17 because the issue raised no substantial issue not already decided by the Supreme Court. Eighteen cases defied classification on this basis. The remaining 17 cases presented questions of principle, although the majority even of these probably did not present questions of the gravity or general importance usually requisite in other areas for granting certiorari.

## II. Papers and Disposition in District Court.

Requests were sent by the Administrative Office of the United States Courts to the clerks in all districts in which there were applications for habeas corpus subsequent to a denial of certiorari in the October 1950 Term. In addition to a request for all docket entries and orders or opinions, the clerks were requested to send copies of all pertinent papers filed in the action by the applicant or to answer a questionnaire concerning those papers. In the bulk of the cases, the original papers or copies of them were forwarded to the Administrative Office; these papers, together with the answered questionnaires in the other cases, were the basis of the following analysis.

### A. *The Applications for Habeas Corpus.*

Three applications for habeas corpus had been withdrawn and were unavailable; of the remaining 123, 17 were drawn by lawyers. Thirty-four failed to meet the minimum standards for showing some degree of familiar-

---

[13] See Rules Sup. Ct. 38 (5), 38½.

ity with law referred to in connection with the petitions for certiorari.[14]   Of 122 applications for which data were available, 101 were typed or printed.   The number of pages ran slightly less than in the petitions for certiorari; [15] 67 applications for habeas corpus contained 9 pages or less, while 56 contained 10 or more.

B. *Supporting Papers Filed: Reference to Certiorari.*

Table 2 below shows to what degree the applicant informed the District Court of the previous certiorari proceedings, and demonstrates that in about 10% of the cases there was not even a reference by the applicant to the fact that he had petitioned for certiorari.   Further, in the large majority of cases, there was simply an allegation that a petition for certiorari had been filed and denied.   In less than 10% of the cases did the applicant file any papers which would serve to indicate to the District Court what questions were before the Supreme Court.

TABLE 2. FILING OF PETITION FOR CERTIORARI IN DISTRICT COURT [16]

| | | | |
|---|---|---|---|
| Total Cases for which data available_ _ _ _ _ _ _ _ _ _ _ | | 123 | 100. 0% |
| Petition for Certiorari filed: | | | |
| Certified Petition_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | 1 | | |
| Uncertified Petition_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | 10 | | |
| Excerpts from Petition_ _ _ _ _ _ _ _ _ _ _ _ | 1 | | |
| Total, petition or excerpts filed_ _ _ _ _ _ _ _ _ _ _ _ _ | | 12 | 9. 8 |
| Mere reference to denial of certiorari_ _ _ | 98 | | |
| No reference to certiorari proceedings_ _ _ | 13 | | |
| Total, no information as to contents of   petition_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ . | | 111 | 90. 2 |

[14] See p. 516, *supra.*

[15] See p. 516, *supra.*

[16] These figures reflect only the information or papers filed by the applicant and not any information or papers filed by the State or given the District Judge in oral argument.   However, it can fairly be

C. *Supporting Papers Filed: Reference to State Proceedings.*

Somewhat fewer papers, on a percentage basis, were filed by applicants in the District Courts than in the Supreme Court concerning the record in the State courts. There seems no explanation for this difference.[17]  Of chief significance, however, was the extent to which papers filed in the District Courts were alleged to have been presented to the Supreme Court in the petition for certiorari.  It is clear that the District Courts may have learned in oral argument or by other means whether the papers had been filed previously in the Supreme Court, but since such information was thought impossible to obtain, it was necessary to limit the inquiry to allegations that the papers had also been before the Supreme Court.  The almost negligible number of cases in which the papers filed were alleged also to have been before the Supreme Court is striking.  Even in cases conducted throughout by apparently competent counsel, such allegations were often not made. The failure to make these allegations may reflect either a fear of counsel or applicants without counsel that a demonstration of the presentation made to the Supreme

asserted that at least in those cases where the entire files of the District Court were sent in response to the questionnaires, the pleadings of the State only occasionally referred to the denial of certiorari and almost never gave any information concerning the petition or the papers filed in the Supreme Court.

[17] In a few cases, the district clerks may not have given the requested information in sufficient detail.  However, in all cases where any such deficiency was apparent, second requests for information were sent out and answers received, so that only those cases where the deficiency was not apparent would be in error.  From the excellence of the response in most cases to the questionnaires, it seems unlikely that whatever error arises from cases in which the deficiency of the answers was not apparent could account for the discrepancies in the figures.

Court would prejudice their cases or perhaps a feeling that it is unimportant to the District Judge that the papers had also been before the Supreme Court. In any event, it has not been a practice, apparently, to allege what papers were before the Supreme Court. Columns 2 and 3 of Table 1, *supra,* set out information exactly parallel to that contained in Column 1, which shows what papers from the State proceedings were filed in the Supreme Court. Column 2 shows the same information for the District Court, and Column 3 shows how many of the papers before the Supreme Court and then filed in the District Court were alleged to have been filed in the Supreme Court. Comparison of Columns 1 and 3 shows to what extent papers actually before the Supreme Court were alleged to have been there. For example, in 30 cases the Supreme Court had some information concerning the opinion in the State proceedings. The District Court was told, however, that the opinion had been before the Supreme Court in only 3 of those 30 cases. Column 2 shows that altogether there were 21 cases in which the District Courts had information concerning the opinion.

A synoptic view of the comparisons made in Table 1 can be had by comparing the line indicating the number of cases in which the record or excerpts were filed. Thus, in over 80% of the cases, the Supreme Court had some part of the State court record, while in just over 70% of the cases, the District Court had some part of the State court record. In less than 6% of the cases was the District Court told by allegation that the parts of the record before it had been in the Supreme Court.

D. *Issues Raised.*

The issues raised were of course approximately the same as those raised in the Supreme Court, with only in-

substantial variation from the figures given above [18] for the types of claims raised in the Supreme Court. But of some significance was a comparison of the claims in the Supreme Court with those made by the same petitioners later in the District Courts. In the 125 cases for which data were available, the chief claim made in the Supreme Court was also the chief claim made in the District Court in 105 cases. That number, of course, is subject to some subjective error because of possibly differing interpretations of what the chief claim of an unclear and unlawyerlike petition is. Perhaps more significant are summaries made which show that the claim that was considered the chief claim in the Supreme Court reappeared, but not necessarily as the chief claim, in 107 of the District Court cases; conversely, in 117 cases, the chief claim before the District Court had been raised in the Supreme Court petition. These data indicate only that it cannot always be assumed that even on the same record and in the same course of proceedings, the emphasis on various claims raised will be the same. Further, in some cases, the claims raised in the District Courts may not have been made at all in the Supreme Court.

E. *Disposition of the Cases in the District Courts.*

In only 1 case of the 126 was the writ of habeas corpus granted. The District Court had originally denied the application for the writ because of a reluctance to review an application already passed on by the highest State court, but after reversal on appeal,[19] the writ was

---

[18] See p. 520, *supra.*

[19] *Anderson* v. *Eidson,* 191 F. 2d 989. A letter from the office of the Jackson County Sheriff, Kansas City, Missouri, to Mr. Will Shafroth, Chief of the Division of Procedural Studies and Statistics, advises that the applicant was remanded to the custody of the Sheriff and the case was dismissed by the Jackson County prosecutor

granted. In 120, the application for the writ has been denied, and 5 are still pending, 1 on remand from appeal. Table 3 sets out the extent to which appeal to the Court of Appeals has been sought or taken. It shows that there have been decisions on appeal in 14 cases with reversals in 3. Of those 3 cases reversed and remanded, one is pending, in one the writ has been granted and in the third the application was withdrawn.

TABLE 3. APPEAL FROM DISTRICT COURT DECISIONS

Total Cases for which data available_____ 126

No entries as to appeal on District Court docket_____ 66
Certificate of probable cause denied, or leave to appeal *in forma pauperis* denied_____ 29
Appeal dismissed; mandamus dismissed_____ 5

Appeal pending_____ 8
Affirmed on appeal_____ 11
Reversed and remanded on appeal_____ 3

A variety of procedures were adopted in these cases by the District Courts in dealing with the applications. Chief among the orders entered other than to dismiss the applications without more were orders to show cause or to answer, as Table 4 shows. In 23 cases, a lawyer was appointed either as an *amicus* or as counsel for the applicant. In some cases, the writ of habeas corpus was issued to bring the applicant before the Court. Table 4 shows which of the devices were used and in what combinations.

---

for lack of available witnesses on December 6, 1951, about one and one-half years after applicant had first raised the claim in the State courts. He had presented his claim to two State courts, the United States Supreme Court, the Federal District Court, and the Court of Appeals for the Eighth Circuit, which reversed a refusal below to grant a hearing and remanded. The discharge of the prisoner occurred almost 20 years after his arrest and conviction on a plea of guilty on several unrelated counts, one of them capital.

TABLE 4. PROCEDURES USED IN DISPOSING OF APPLICATIONS

Total Cases for which data available_____ 123     100. 0%

Applications disposed of without more _____  56      45. 6%

Orders to Show Cause or Answer:
    Order to Show Cause_____    37
    Order to Show Cause; Counsel appointed
      for applicant_____     4
    Order to Answer_____     3
    Order to Answer; *Amicus* appointed_____     3

Writs of Habeas Corpus issued:
    Writ issued_____     2
    Writ issued; Counsel appointed for ap-
      plicant _____     3

Writs and Orders:
    Writ Issued; Order to Show Cause_____     1
    Writ Issued; Order to Show Cause; Counsel
      appointed for applicant_____     5

Lawyers Appointed:
    As *amicus*, in combination with other orders
      already listed above_____    (3)
    As counsel for applicant, in connection with
      other orders already listed above_____   (12)
    As *amicus* without other order_____     2
    As counsel for applicant without other
      order_____     6

A hearing of some kind was given in 44 cases of the 122 for which data are available.[20] The other 22 cases not disposed of without more were disposed of by withdrawal of the application (one case) or after the answer, the report of the *amicus,* or both. Certain data concerning the hearings are set out in Table 5. Table 5 shows what procedures were used and how long the hearing lasted. It shows that the applicant was present at 26

[20] In some cases, it was difficult to determine from the docket entries whether a hearing had been held. A procedure was considered a hearing if at least one party, the State or the applicant, had appeared in court and argued points of law or fact to the Court, in addition to all procedures resulting in docket entries stating that a hearing had been held.

hearings, with counsel also in 17 of those cases. The applicant was represented by counsel in 31 cases, but the applicant himself was not present in 14 of those 31 cases. The length of the hearings for which data were available was an hour or less in two-thirds of the cases.

TABLE 5. PRESENCE AT HEARING AND LENGTH OF HEARING

I. Total Cases in which hearings held_____ 44

Data unavailable_____ 1
Applicant and counsel present_____ 17
Applicant present without counsel_____ 9
Applicant absent but represented by counsel [21]_____ 14
Applicant absent and not represented by counsel_____ 3

II. Total Cases for which data as to length of hearing available [22]. 24

Length of hearing:
    Fifteen minutes or less_____ 2
    Fifteen to thirty minutes_____ 8
    Thirty minutes to one hour_____ 6

       Total, one hour or less_____ 16

    Two hours_____ 1
    Two and a half hours_____ 1
    Three hours_____ 1
    Four hours_____ 4

    Three days_____ 1

       Total, over one hour_____ 8

[21] Including one case in which counsel was present but in which it does not appear whether applicant was present.

[22] In two of the cases in which there was no information as to the length of the hearing, there is information concerning the length of the transcript made by the court stenographer. In one, it was 20 pages; in the other 46. In five cases for which information was available as to the length of the hearing, data were also given showing the length of the transcript. One of the hearings lasting one hour had a transcript of 36 pages. The hearing lasting three hours had a transcript of 15 pages. One of the hearings lasting four hours had a transcript of 28 pages, another one of 79 pages. The hearing lasting three days had a transcript of 319 pages.

The average time of disposition of applications for habeas corpus in the District Courts was 59.4 days,[23] as compared with the disposition time in the Supreme Court of 52.5 days. In the District Court, however, only 56 applications were dismissed without more, while in the Supreme Court all but 35, or 91 petitions for certiorari, were disposed of without further action such as the filing of a response by the State. For whatever significance it might have, the important figure seemed to be that showing the number of cases in which the District Court disposition time was greater than in the Supreme Court; of the 122 cases for which figures are available, 45 took longer from the time of filing until denial of the application for habeas corpus than they had in the Supreme Court. Of those 45, only 4 had been dismissed without further pleadings or action of some sort.

In 98 cases, the District Courts indicated their reasons for denying the applications for habeas corpus. As will be seen from Table 6, the District Courts decided only about half of the cases directly on the merits, either holding against the applicant on the facts or on his constitutional claim. In 45, or almost half, of the 98 cases, the application was denied on various grounds bearing on the relation between the Federal and State courts in these cases. Twenty-nine of these 45 denials were based on the applicant's failure to exhaust the State remedy. Since this reason was often not amplified, it is not possible

---

[23] The time was computed from the day of filing of the application for habeas corpus until its dismissal. It does not take into account any appeal time. It is slightly inaccurate because most cases are filed *in forma pauperis,* so that a few days may elapse between the time the Court receives the application and the time it grants leave to file *in forma pauperis.* In all cases where the docket or other papers indicated the date such an application was received, that date was used rather than the date shown by the docket as the date on which the application was filed.

TABLE 6. GROUNDS FOR DENIAL OF APPLICATIONS IN DISTRICT COURTS

Total Cases in Survey_____ 126

Pending_____ 5
Writ granted_____ 1

Total cases for which data available_____ 120

I. *Reasons Stated for Dismissal.*

    Reasons not going directly to the merits:
        Issue fairly considered in State Court_____ 7
        Applicant had his day in State Court, and Federal
            Courts will not ordinarily reexamine_____ 9
        Failure to exhaust State remedy_____ 29

        Total_____ 45

    Reasons going directly to the merits:
        Want of a federal question_____ 21
        Applicant not within invoked Federal doctrine[24]___ 8
        Claim not supported by facts_____ 17
        Insufficient facts alleged in support of claim_____ 2

        Total_____ 48

    Miscellaneous:
        Application withdrawn by applicant_____ 3
        Lack of jurisdiction—wrong District_____ 1
        Same issue formerly considered in a Federal Court_ 1

        Total_____ 5

    No Reason Stated except that applicant not entitled to
        writ, or lack of jurisdiction to grant_____ 22

II. *Probable Reasons where no reason stated.*

    Issue fairly considered in State Court_____ 1

    Want of a Federal question_____ 18
    Applicant not within invoked Federal doctrine_____ 1
    Claim not supported by the facts_____ 2

---

[24] That is, the claim is in an area in which Federal protection is afforded, *e. g.*, representation by counsel, but the applicant does not show that his case comes within the requirements for protection, *e. g.*, ignorance and inability adequately to defend himself.

to classify these cases further. But from those cases in which a more detailed statement of the reason was made and from other information available in some cases, it is possible to say that there were several views below as to what the requirement of "exhaustion" implied. In some cases, the applicant had not complied with formal requirements, such as those prescribing the time of filing or the kind of papers to be filed for an appeal to a higher State court. In others, the applicant had fully invoked one remedy, but other State remedies were still available, or the remedy already invoked was, under the State procedural rules, available again. In some cases, of course, the applicant failed to allege or show any real attempt to invoke a State remedy. The other 16 of the 45 cases not decided directly on the merits were disposed of as the result of varying degrees of reliance on the State adjudication. As Table 6 shows, in some cases the judges below stated that the applicant had had his day in the State courts and the Federal courts will not ordinarily reexamine State denials of relief to prisoners, while in others they felt that the claim had been fairly considered in the State courts.

MR. JUSTICE JACKSON, concurring in the result.

Controversy as to the undiscriminating use of the writ of habeas corpus by federal judges to set aside state court convictions is traceable to three principal causes: (1) this Court's use of the generality of the Fourteenth Amendment to subject state courts to increasing federal control, especially in the criminal law field; (2) *ad hoc* determination of due process of law issues by personal notions of justice instead of by known rules of law; and (3) the breakdown of procedural safeguards against abuse of the writ.

1. In 1867, Congress authorized federal courts to issue writs of habeas corpus to prisoners "in custody in vio-

lation of the Constitution or laws or treaties of the United States." [1]  At that time, the writ was not available here nor in England to challenge any sentence imposed by a court of competent jurisdiction.[2]  The historic purpose of the writ has been to relieve detention by executive authorities without judicial trial.[3]  It might have been expected that if Congress intended a reversal of this traditional concept of habeas corpus it would have said so.  However, this one sentence in the Act eventually was construed as authority for federal judges to entertain collateral attacks on state court criminal judgments.[4] Whatever its justification, it created potentialities for conflict certain to lead to the antagonisms we have now, unless the power given to federal judges were responsibly used according to lawyerly procedures and with genuine respect for state court fact finding.

But, once established, this jurisdiction obviously would grow with each expansion of the substantive grounds

---

[1] 28 U. S. C. § 2241 (c) (3).

[2] *Ex parte Ferguson,* [1917] 1 K. B. 176, 179; *Ex parte Lees,* El. Bl. & El. 828, 120 Eng. Rep. 718; *In re Dunn,* 5 C. B. 215, 136 Eng. Rep. 859; Habeas Corpus Act of 1679, 31 Car. II, c. 2; *Ex parte Watkins,* 3 Pet. 193, 202.

[3] *Darnel's Case,* 3 How. St. Tr. 1 (1627).  For this purpose, the writ has not been conspicuously successful in the United States.  I have reviewed its failures, especially in wartimes, in Wartime Security and Liberty under Law, 1 Buff. L. R. 103; *United States ex rel. Knauff* v. *Shaughnessy,* 338 U. S. 537.

[4] See the equivocal discussion of the question in *Frank* v. *Magnum,* 237 U. S. 309, 326–332, and the more explicit assumption of the dissent, *id.,* at 348.  An earlier case, *Ex parte Royall,* 117 U. S. 241, contained a dictum to the effect that legislative jurisdiction—the validity of the statute under which conviction was had in the state court—could be challenged on habeas corpus in the federal courts.  While this represents a certain expansion of traditional notions of jurisdiction in the judicial sense, it by no means supports the broad reach given to federal habeas corpus by recent cases.  See also *Moore* v. *Dempsey,* 261 U. S. 86; *Mooney* v. *Holohan,* 294 U. S. 103.

for habeas corpus. The generalities of the Fourteenth Amendment are so indeterminate as to what state actions are forbidden that this Court has found it a ready instrument, in one field or another, to magnify federal, and incidentally its own, authority over the states. The expansion now has reached a point where any state court conviction, disapproved by a majority of this Court, thereby becomes unconstitutional and subject to nullification by habeas corpus.[5]

This might not be so demoralizing if state judges could anticipate, and so comply with, this Court's due process requirements or ascertain any standards to which this Court will adhere in prescribing them. But they cannot. Of course, considerable uncertainty is inherent in decisional law which, in changing times, purports to interpret implications of constitutional provisions so cryptic and vagrant. How much obscurity is inevitable will be a matter of opinion. However, in considering a remedy for habeas corpus problems, it is prudent to assume that the scope and reach of the Fourteenth Amendment will continue to be unknown and unknowable, that what seems established by one decision is apt to be unsettled by another, and that its interpretation will be more or less swayed by contemporary intellectual fashions and political currents.

We may look upon this unstable prospect complacently, but state judges cannot. They are not only being gradually subordinated to the federal judiciary but federal courts have declared that state judicial and other officers are personally liable to federal prosecution and to

---

[5] An idea of the uncertainty and diversity of views in this field may be gleaned from a comparison of *Rochin* v. *California,* 342 U. S. 165, with *Wolf* v. *Colorado,* 338 U. S. 25, and *Adamson* v. *California,* 332 U. S. 46.

civil suit by convicts if they fail to carry out this Court's constitutional doctrines.[6]

2. Rightly or wrongly, the belief is widely held by the practicing profession that this Court no longer respects impersonal rules of law but is guided in these matters by personal impressions which from time to time may be shared by a majority of Justices. Whatever has been intended, this Court also has generated an impression in much of the judiciary that regard for precedents and authorities is obsolete, that words no longer mean what they have always meant to the profession, that the law knows no fixed principles.

A manifestation of this is seen in the diminishing respect shown for state court adjudications of fact. Of course, this Court never has considered itself foreclosed by a state court's decision as to the facts when that determination results in alleged denial of a federal right. But captious use of this power was restrained by observance of a rule, elementary in all appellate procedure, that the findings of fact on a trial are to be accepted by an appellate court in absence of clear showing of error. The

---

[6] This Court's decision in *Screws* v. *United States,* 325 U. S. 91, as the dissenters anticipated, has led a Federal Court of Appeals to hold that federal law enforced in federal courts imposes personal liability upon state judicial officers, though that court admits that "The result is of fateful portent to the judiciary of the several states." *Picking* v. *Pennsylvania R. Co.,* 151 F. 2d 240, 250. Contrast to this the absolute immunity from suit enjoyed by federal officials, even in administrative capacities. *Gregoire* v. *Biddle,* 177 F. 2d 579. While the *Screws* decision held out promise of protection for state officials by requiring that any denial of constitutional right must be proved to be wilful in the sense of knowing and intentional, that protection has since been withdrawn. Another Court of Appeals upheld a conviction based on a charge that wilfulness and intent are "presumed and inferred from the result of the action." 189 F. 2d 711, 714. This Court, against my written dissent calling attention to its effect, refused review. *Koehler* v. *United States,* 342 U. S. 852.

trial court, seeing the demeanor of witnesses, hearing the parties, giving to each case far more time than an appellate court can give, is in a better position to unravel disputes of fact than is an appellate court on a printed transcript. Recent decisions avow no candid alteration of these rules, but revision of state fact finding has grown by emphasis, and respect for it has withered by disregard.[7]

3. The fact that the substantive law of due process is and probably must remain so vague and unsettled as to invite farfetched or borderline petitions makes it important to adhere to procedures which enable courts readily to distinguish a probable constitutional grievance from a convict's mere gamble on persuading some indulgent judge to let him out of jail. Instead, this Court has sanctioned progressive trivialization of the writ until floods of stale, frivolous and repetitious petitions inundate the docket of the lower courts and swell our own.[8] Judged by our own disposition of habeas corpus matters,

---

[7] See, e. g., United States v. Oregon State Medical Society, 343 U. S. 326, for a recent example of the application of the presumption in favor of a lower federal court's finding of fact. Compare Watts v. Indiana, 338 U. S. 49; Turner v. Pennsylvania, 338 U. S. 62; Harris v. South Carolina, 338 U. S. 68; and Malinski v. New York, 324 U. S. 401, with the above for illustrations of cases in which this salutary presumption in favor of state court findings was disregarded in fact if not in theory.

[8] There were filed in federal district courts during 1941 one hundred twenty-seven petitions for habeas corpus challenging state convictions; in 1943 there were two hundred sixty-nine; in 1948 five hundred forty-three; in 1952 five hundred forty-one. Speck, Statistics on Federal Habeas Corpus, 10 Ohio St. L. J. 337, shows that during the period from 1943 through 1945 there were a high number of petitions filed by those convicts who had filed at least one such petition in *federal* court before. In federal courts in New Hampshire and South Dakota, the percentage of the total petitions made up by repeaters was 50%. The percentages for the larger states on which statistics were then available are as follows: California, 12%; Illinois, 19%; Massachusetts, 20%; Missouri, 21%; New Jersey, 17%; New York,

they have, as a class, become peculiarly undeserving.[9] It must prejudice the occasional meritorious application to be buried in a flood of worthless ones. He who must search a haystack for a needle is likely to end up with the attitude that the needle is not worth the search. Nor is it any answer to say that few of these petitions in any court really result in the discharge of the petitioner.[10] That is the condemnation of the procedure which has encouraged frivolous cases. In this multiplicity of worthless cases, states are compelled to default or to defend the integrity of their judges and their official records, sometimes concerning trials or pleas that were closed many years ago.[11] State Attorneys General recently have come habitually to ignore these proceedings, responding only when specially requested and sometimes

---

18%; Pennsylvania, 22%; Texas, 25%. These figures show an unnecessary burden on the federal courts by quantitative as well as dramatic tests.

[9] See Speck, *supra*, Table 3, p. 349.

[10] Statistics of the Administrative Office of the United States Courts for the period 1946–1952 show that, in 1946, 2.8% of the petitioners were successful; in 1952, 1.8% were successful.

[11] Pages full of numbers fail to indicate what the states must contend with as vividly as the history of particular litigation. The *Wells* litigation in California is an object lesson in conflict. Wells was sentenced to death by the California trial court, and this judgment was affirmed by the Supreme Court of California in an opinion which gave extended consideration to the appellant's contentions. *People* v. *Wells*, 33 Cal. 2d 330, 202 P. 2d 53. This Court denied certiorari, *Wells* v. *California*, 338 U. S. 836. Wells, without seeking habeas corpus in state court, then petitioned a federal district judge in California for habeas corpus. That judge took the unusual step of passing on the merits of the case in spite of the fact that state remedies had not been exhausted and the prisoner had to be remitted to the state courts. The district judge held on the merits that the California courts had misapplied California law. *Ex parte Wells*, 90 F. Supp. 855. When the petitioner applied to the Supreme Court of California for a writ of habeas corpus, as he was instructed to do by the district judge, that court adhered to its prior view as to what the

not then.   Some state courts have wearied of our repeated demands upon them and have declined to further elucidate grounds for their decisions.[12]   The assembled

---

law of California was.  *In re Wells*, 35 Cal. 2d 889, 221 P. 2d 947. This Court again denied certiorari.  *Wells* v. *California*, 340 U. S. 937. Thereafter the same federal judge, although now conceding that he must take California law from California courts, voided the conviction on a federal ground not even mentioned in his earlier opinion. *Ex parte Wells*, 99 F. Supp. 320.   The opinions of the district judge show that he was well aware of the difficulties presented by the procedure, but felt he had no alternative in the light of this Court's decisions.   Indeed, he has contributed the lessons of his own experience in this field in Goodman, Use and Abuse of the Writ of Habeas Corpus, 7 F. R. D. 313.   Another caricature of the great writ in action is the *Adamson* litigation in California.   Adamson was sentenced to death in the California trial court in 1944.   The Supreme Court of California affirmed the judgment of conviction in 1946.  *People* v. *Adamson*, 27 Cal. 2d 478, 165 P. 2d 3.   This Court *granted* certiorari, heard the case on the merits, and *affirmed*.  *Adamson* v. *California*, 332 U. S. 46.   On January 30, 1948, just one week before the date set for his execution, Adamson petitioned the Supreme Court of California for habeas corpus, and this petition was denied.   This Court denied application for a stay and denied certiorari to the Supreme Court of California.  *Adamson* v. *California*, 333 U. S. 831.   Later on the same day that this Court denied certiorari, a judge of the United States District Court for the Northern District of California issued a stay of execution of the sentence.   Then the District Court denied the writ and denied a certificate of probable cause to appeal.   In *Ex parte Adamson*, 167 F. 2d 996, a judge of the United States Court of Appeals denied an application for a certificate of probable cause.   This Court again denied certiorari. *Ex parte Adamson*, 334 U. S. 834.   Even this was not the end, however, for in 1949 we find Adamson appealing to the Supreme Court of California from a denial of an application for a writ of *coram nobis.*   That court then took occasion to question the good faith of the proceedings.   34 Cal. 2d 320, 338, 210 P. 2d 13, 22.   Certainly the use of the federal courts as aids in such delaying tactics as are evidenced here does not elevate the stature of the writ of habeas corpus.   We have no mythical abuse here but a very real problem of harassment of the state.

[12] *Dixon* v. *Duffy*, 344 U. S. 143.

Chief Justices of the highest courts of the states have taken the unusual step of condemning the present practice by resolution.[13]

It cannot be denied that the trend of our decisions is to abandon rules of pleading or procedure which would

---

[13] Conference of Chief Justices—1952, 25 State Government, No. 11, p. 249 (Nov. 1952):

"Whereas it appears that by reason of certain principles enunciated in certain recent federal decisions, a person whose conviction in a criminal proceeding in a State Court has thereafter been affirmed by the highest court of that State, and whose petition for a review of the State Court's proceedings has been denied by the Supreme Court of the United States, may nevertheless obtain from a Federal district judge or Court, under a writ of habeas corpus, new, independent, and successive hearings based upon a petition supported only by the oath of the petitioner and containing only such statement of facts as were, or could have been, presented in the original proceedings in the State Courts;

"And whereas the multiplicity of these procedures available in the inferior Federal Courts to such convicted persons, and the consequent inordinate delays in the enforcement of criminal justice as the result of said Federal decisions will tend toward the dilution of the judicial sense of responsibility, may create grave and undesirable conflicts between Federal and State laws respecting fair trial and due process, and must inevitably lead to the impairment of the public confidence in our judicial institutions;

"Now therefore be it resolved that it is the considered view of the Chief Justices of the States of the Union, in conference duly assembled, that orderly Federal procedure under our dual system of government should require that a final judgment of a State's highest court be subject to review or reversal only by the Supreme Court of the United States.

"Be it further resolved that the Chairman of the Conference of Chief Justices be authorized, and he is hereby directed, to appoint a special committee to give study to the grave questions and potential complications likely to ensue if the power to review or void state court judgments continues to be recognized as lying in any courts of the Federal judicial system, save and except the Supreme Court of the United States: and that said special committee report its findings and recommendations at the next regular meeting of the Conference."

protect the writ against abuse. Once upon a time the writ could not be substituted for appeal or other reviewing process but challenged only the legal competence or jurisdiction of the committing court.[14] We have so departed from this principle that the profession now believes that the issues we *actually consider* on a federal prisoner's habeas corpus are substantially the same as would be considered on appeal.[15]

Conflict with state courts is the inevitable result of giving the convict a virtual new trial before a federal court sitting without a jury. Whenever decisions of one court are reviewed by another, a percentage of them are reversed. That reflects a difference in outlook normally found between personnel comprising different courts. However, reversal by a higher court is not proof that justice is thereby better done. There is no doubt that if there were a super-Supreme Court, a substantial proportion of our reversals of state courts would also be reversed. We are not final because we are infallible, but we are infallible only because we are final.

As to the pleading requirements in habeas corpus, what has happened may best be learned by comparison of the meticulously pleaded facts and circumstances relied upon by this Court's opinion in *Moore* v. *Dempsey,* 261 U. S. 86 (1923), and in *Mooney* v. *Holohan,* 294 U. S. 103 (1935), with condonation of their absence in *Price* v. *Johnston,* 334 U. S. 266 (1948). It really has become necessary to plead nothing more than that the prisoner is in jail, wants to get out, and thinks it is illegal to hold

---

[14] *Ex parte Watkins,* 3 Pet. 193, 202.

[15] Such was the view expressed by the Solicitor General of the United States at the Bar of this Court during argument of *Martinez* v. *Neelly,* affirmed by an equally divided Court, 344 U. S. 916. His adversary agreed.

him.[16]   If he fails, he may make the same plea over and over again.[17]

Since the Constitution and laws made pursuant to it are the supreme law and since the supremacy and uniformity of federal law are attainable only by a centralized source of authority, denial by a state of a claimed federal right must give some access to the federal judicial system. But federal interference with state administration of its criminal law should not be premature and should not occur where it is not needed.   Therefore, we have ruled that a state convict must exhaust all remedies which the state affords for his alleged grievance before he can take it to any federal court by habeas corpus.

The states all allow some appeal from a judgment of conviction which permits review of any question of law, state or federal, raised upon the record.   No state is obliged to furnish multiple remedies for the same grievance.   Most states, and with good reason, will not suffer a collateral attack such as habeas corpus to be used as a substitute for or duplication of the appeal.   A state properly may deny habeas corpus to raise either state or federal issues that were or could have been considered on appeal.   Such restriction by the state should be respected by federal courts.

Assuming that a federal question not reachable on appeal is properly presented by habeas corpus and decided adversely by the highest competent court of the state, should the prisoner then come to this Court and ask us to review the record by certiorari or should he go to the district court and institute a new federal habeas corpus proceeding?   *Darr* v. *Burford,* 339 U. S. 200, as

---

[16] *Price* v. *Johnston, supra.*

[17] In *Price* v. *Johnston, supra,* the lower federal courts were reversed for dismissing the convict's fourth petition. See also statistics as to repeaters in note 8, *supra.*

I understand it, held that in these circumstances the prisoner must apply to this Court for certiorari before he can go to any other federal court, because only by so doing could he exhaust his state remedy. Whatever one may think of that result, it does not seem logical to support it by asserting that this Court's certiorari power is any part of a state's remedy. An authority outside of the state imposes a duty upon the state to turn the case over to it, in a proceeding which makes the state virtually a defendant. To say that our command to certify the case to us is a state remedy is to indulge in fiction, and the difficulty with fictions is that those they are most apt to mislead are those who proclaim them.

But now it is proposed to neutralize the artificiality of the process and counterbalance the fiction that our certiorari is a state remedy by holding that this step which the prisoner must take means nothing to him or the state when it fails, as in most cases it does.

The Court is not quite of one mind on the subject. Some say denial means nothing, others say it means nothing much. Realistically, the first position is untenable and the second is unintelligible. How can we say that the prisoner must present his case to us and at the same time say that what we do with it means nothing to anybody. We might conceivably take either position but not, rationally, both, for the two will not only burden our own docket and harass the state authorities but it makes a prisoner's legitimate quest for federal justice an endurance contest.

True, neither those outside of the Court, nor on many occasions those inside of it, know just what reasons led six Justices to withhold consent to a certiorari. But all know that a majority, larger than can be mustered for a good many decisions, has found reason for not reviewing the case here. Because no one knows all that a denial means, does it mean that it means nothing?

Perhaps the profession could accept denial as meaningless before the custom was introduced of noting dissents from them. Lawyers and lower judges will not readily believe that Justices of this Court are taking the trouble to signal a meaningless division of opinion about a meaningless act.[18] It is just one of the facts of life that today every lower court does attach importance to denials and to presence or absence of dissents from denials, as judicial opinions and lawyers' arguments show.

The fatal sentence that in real life writes *finis* to many causes cannot in legal theory be a complete blank. I can see order in the confusion as to its meaning only by distinguishing its significance under the doctrine of *stare decisis,* from its effect under the doctrine of *res judicata.* I agree that, as *stare decisis,* denial of certiorari should be given no significance whatever. It creates no precedent and approves no statement of principle entitled to weight in any other case. But, for the case in which certiorari is denied, its minimum meaning is that this Court allows the judgment below to stand with whatever consequences it may have upon the litigants involved under the doctrine of *res judicata* as applied either by state or federal courts. A civil or criminal judgment usually becomes *res judicata* in the sense that it is binding and conclusive even if new facts are discovered and even if a new theory of law were thought up, except for some provision for granting a new trial, which usually is discretionary with the trial court and limited in time.

It is sometimes said that *res judicata* has no application whatever in habeas corpus cases and surely it does not apply with all of its conventional severity. Habeas corpus differs from the ordinary judgment in that, although an adjudication has become final, the application

---

[18] When petitioner in *Brown* v. *Allen* sought certiorari here after his appeal to the state court failed, two Justices dissented from the denial of certiorari. *Brown* v. *North Carolina,* 341 U. S. 943.

is renewable, at least if new evidence and material is discovered or if, perhaps as the result of a new decision, a new law becomes applicable to the case. This is quite proper so long as its issues relate to jurisdiction. But call it *res judicata* or what one will, courts ought not to be obliged to allow a convict to litigate again and again exactly the same question on the same evidence. Nor is there any good reason why an identical contention rejected by a higher court should be reviewed on the same facts in a lower one.

The chief objection to giving this limited finality to our denial of certiorari is that we pass upon these writs of habeas corpus so casually or upon grounds so unrelated to their merits that our decision should not have the weight of finality. No very close personal consideration can be given by each Justice to such a multiplicity of these petitions as we have had and, as a class, they are so frivolous, so meaningless, and often so unintelligible that this worthlessness of the class discredits each individual application. If this deluge were reduced by observance of procedural safeguards to manageable proportions so that it would be possible to examine the cases with some care and to hear those that show merit, I think this objection would largely disappear. The fact is that superficial consideration of these cases is the inevitable result of depreciation of the writ. The writ has no enemies so deadly as those who sanction the abuse of it, whatever their intent.

If a state is really obtaining conviction by laws or procedures which violate the Federal Constitution, it is always a serious wrong, not only to a particular convict, but to federal law. It is not probable that six Justices would pass up a case which intelligibly presented this situation. But an examination of these petitions will show that few of them, tested by any rational rules of pleading, actually raise any question of law on which

the state court has differed from the understanding prevailing in this Court. The point on which we are urged to overrule state courts almost invariably is in their appraisal of facts. For example, the jury, the trial judge, and one or more appellate courts below have held that conflicting evidence proves a confession was voluntary; the prisoner wants us to say the evidence proves it was coerced. The court below found that the prisoner waived counsel and voluntarily pleaded guilty; he wants us to find that he did not. The jury and the trial judge below believed one set of witnesses whose testimony showed his guilt; he wants us to believe the other and to hold that he has been convicted by perjury. That is the type of factual issue upon which this Court and other federal courts are asked to intervene and upset state court convictions. There are plenty of good reasons why we should rarely do that, and even better reasons why the district court should not undertake to do it after we have declined to.

My conclusion is that whether or not this Court has denied certiorari from a state court's judgment in a habeas corpus proceeding, no lower federal court should entertain a petition except on the following conditions: (1) that the petition raises a jurisdictional question involving federal law on which the state law allowed no access to its courts, either by habeas corpus or appeal from the conviction, and that he therefore has no state remedy; or (2) that the petition shows that although the law allows a remedy, he was actually improperly obstructed from making a record upon which the question could be presented, so that his remedy by way of ultimate application to this Court for certiorari has been frustrated. There may be circumstances so extraordinary that I do not now think of them which would justify a departure from this rule, but the run-of-the-mill case certainly does not.

Whether one will agree with this general proposition will depend, I suppose, on the latitude he thinks federal courts should exercise in retrying *de novo* state court criminal issues. If the federal courts are to test a state court's decision by hearing new evidence in a new proceeding, the pretense of exhaustion of state remedies is a sham, for the state courts could not have given a remedy on evidence which they had no chance to hear. I cannot see why federal courts should hear evidence that was not presented to the state court unless the prisoner has been prevented from making a record of his grievance, with the result that there is no record of it to bring here on certiorari: Such circumstances would seem to call for an original remedy in the district courts which would be in a position to take evidence and make the record on which we ultimately must pass if there develops a conflict of law between a federal and state court.

If this Court were willing to adopt this doctrine of federal self-restraint, it could settle some procedures, rules of pleading and practices which would weed out the abuses and frivolous causes and identify the worthy ones. I know the difficulty of formulating practice rules and their pitfalls. Nor do I underestimate the argument that the writ often is petitioned for by prisoners without counsel and that they should not be held to the artificialities in pleading that we expect in lawyers. But I know of no way that we can have equal justice under law except we have some law. I suggest some general principles which, if adhered to, would reduce the number of frivolous petitions, make decision upon them possible at an earlier time and alleviate some of the irritation that is developing over ill-considered federal use of the writ to slap down state courts.

First, habeas corpus shall not (in absence of state law to the contrary) raise any question which was, or could have been, decided by appeal or other procedure for re-

view of conviction. In the absence of showing to the contrary, habeas corpus will be deemed to lie only for defects not disclosed on the record, going to the power, legal competence or jurisdiction of the committing state court.

Second, every petition to a federal court is required, and those to a state court may be required, by state law to contain a plain but full statement of the facts on which it is based. Unless it states facts which, if proved, would warrant relief, the applicant is not entitled as of right to a hearing. Technical forms or artificialities of pleading will not be required.

Presumably a federal court will not release a convict until he proves facts which show invalidity of his conviction. If proof is to be required, it is no hardship to require a simple statement of what it will be. A petitioner should be given benefit of liberal construction, of all usual privileges of amendment, and, if the court finds a probably worthy case, appointment of counsel to aid in amending the petition and presenting the case.

Third, petitions to federal courts are required, and those to state courts may be required, to set forth every previous application to any court for relief on any grounds. If the current petition is made upon the same grounds as an earlier one, it should state fully any evidence now available in its support that was not offered before and explain failure to present it. On the jurisdictional questions appropriate for habeas corpus, the petitioner may not be barred from proof by newly discovered evidence, but it is not asking too much that his petition disclose that he has it and a basis for appraising its relevance and effect. He should not be precluded from raising new grounds of unconstitutionality in a later petition, especially in view of the unsettled character of our constitutional doctrines of due process. But the facts that make the new grounds applicable should appear. If fed-

eral relief is sought on the grounds that state law affords no remedy, or his resort thereto has been obstructed and he has been unable to present his case to a state court, the facts relied on should be clearly and fully set forth.

Much probably may be said in criticism of my statement of these principles but nothing, I am convinced, against their historical authenticity as part of the traditional law of habeas corpus or against their application now to stop abuses so grave that they foreshadow legislative restriction of the writ. They do not foreclose worthy causes but earmark them for the serious treatment they deserve. They will not even wholly eliminate frivolous petitions but will discourage them by exposing their frivolity at an earlier stage.

Society has no interest in maintaining an unconstitutional conviction and every interest in preserving the writ of habeas corpus to nullify them when they occur. But the Constitution does not prevent the state courts from determining the facts in criminal cases. It does not make it unconstitutional for them to have a different opinion than a federal judge about the weight to be given to evidence. My votes in the cases under review and on other petitions and reviews will be guided as nearly as I can by the principles set forth herein.

I concur in the result announced by MR. JUSTICE REED in these three cases.

MR. JUSTICE BLACK, with whom MR. JUSTICE DOUGLAS concurs, dissenting.

The four petitioners in these cases are under sentences of death imposed by North Carolina state courts. All are Negroes. Brown and Speller were convicted of raping white women; the two Daniels, aged 17 when arrested, were convicted of murdering a white man. The State Supreme Court affirmed and we denied certiorari in all

the cases. These are habeas corpus proceedings which challenge the validity of the convictions.

I agree with the Court that the District Court had habeas corpus jurisdiction in all the cases including power to release either or all of the prisoners if held as a result of violation of constitutional rights. This I understand to be a reaffirmance of the principle embodied in *Moore* v. *Dempsey*, 261 U. S. 86. I also agree that in the exercise of this jurisdiction the District Court had power to hear and consider all relevant facts bearing on the constitutional contentions asserted in these cases. I disagree with the Court's conclusion that. petitioners failed to establish those contentions. The chief constitutional claims throughout have been and are: (a) extorted confessions were used to convict; (b) Negroes were deliberately excluded from service as jurors on account of their race. For the following reasons I would reverse each of the judgments denying habeas corpus.

*First.* In denying habeas corpus in all the cases, the District Court felt constrained to give and did give weight to our prior denials of certiorari. So did the Court of Appeals. I agree with the Court that this was error but disagree with its holding that the error was harmless. It is true that after considering our denials of certiorari as a reason for refusing habeas corpus, the district judge attempted to pass upon the constitutional questions just as if we had not declined to review the convictions. But the record shows the difficulty of his attempt to erase this fact from his mind and I am not willing to act on the assumption that he succeeded in doing so. Both the jury and confession questions raised in these death cases have entirely too much record support to refuse relief on such a questionable assumption. I would therefore reverse and remand all the cases for the district judge to consider and appraise the issues free from his erroneous

belief that this Court decided them against petitioners by denying certiorari.

*Second. Brown* v. *Allen,* No. 32. Brown's death sentence for rape rests on an indictment returned by a Forsyth County grand jury. We recently reversed five North Carolina convictions on the ground that there had been a systematic racial exclusion of Negroes from Forsyth County's juries for many years prior to 1947. *Brunson* v. *North Carolina,* 333 U. S. 851 (1948). Upon a review of the evidence in Brown's habeas corpus proceeding this Court holds that Forsyth County's discriminatory jury practice was abandoned in 1949 when the old jury boxes were refilled. The testimony on which the Court relies is that the names put in the 1949 box were taken indiscriminately from the list of county taxpayers, 16% of whom were Negroes, 84% whites. Other evidence relied on was that since 1949 four to seven Negroes have been included in each jury venire of 44 to 60. The concrete effect of the new box in this case was stated by the North Carolina Supreme Court to be this:

> "One Negro woman served on the grand jury and at least one prospective Negro juror was tendered to the defendant for the petit jury and was excused or rejected by his counsel." *State* v. *Brown,* 233 N. C. 202, 205, 63 S. E. 2d 99, 101.

The foregoing evidence does show a partial abandonment of the old discriminatory jury practices—since 1949 a small number of Negroes have regularly been summoned for jury duty. But proof of a lesser degree of discrimination now than before 1949 is insufficient to show that impartial selection of jurors which the Constitution requires. Negroes are about one-third of Forsyth County's population. Consequently, the number of Negroes now called for jury duty is still glaringly disproportionate to their percentage of citizenship. It is not possible to at-

tribute either the pre-1949 or the post-1949 dispropor-
tions entirely to accident. And the state has not pro-
duced evidence to show that the partial continuation of
the long-standing failure to use Negro jurors is due to
some cause other than racial discrimination. Cf. *Patton*
v. *Mississippi,* 332 U. S. 463, 466, 468–469. Recognizing
this difficulty the Court sanctions the continued dispro-
portions because they were the result of selecting jurors
exclusively from the county tax list. But even this ques-
tionable method of selection falls short of showing a
genuine abandonment of old discriminatory practices.
Certainly discriminatory results remained. I do not be-
lieve the Court should permit this tax list tech-
nique to be treated as a complete neutralizer of racial
discrimination.

*Third. Speller* v. *Allen,* No. 22. The jury that tried
Speller was drawn from Vance County, North Carolina.
Before this trial no Negro had served on a Vance County
jury in recent years. No Negro had even been sum-
moned. That this was the result of unconstitutional dis-
crimination is made clear by the fact that Negroes con-
stitute 45% of the county's population and 38% of its
taxpayers. The Court holds, however, that this discrimi-
nation was completely cured by refilling the jury box with
the names of 145 Negroes and 1,981 whites. Such a small
number of Negro jurors is difficult to explain except on the
basis of racial discrimination. The Court attempts to
explain it by relying upon another discrimination, one
which can hardly be classified as most appealing in a
democratic society. What the Court apparently finds is
that Negroes were excluded from this new jury box not
because they were Negroes but because they happened to
own less property than white people. In other words, the
Court finds as a fact that the discrimination, if any, was
based not on race but on wealth—the jurors were selected
from taxpayers with "the most property." The Court

then even declines to pass on the constitutionality of this property discrimination on the ground that petitioner's objections were based on racial, not on property, discriminations. I cannot agree to such a narrow restriction of petitioner's objections to the jury that brought in the death verdict. Jury discriminations here seem plain to me and I would not by-pass them.

*Fourth. Daniels* v. *Allen,* No. 20. Here also evidence establishes an unlawful exclusion of Negroes from juries because of race. The State Supreme Court refused to review this evidence on state procedural grounds. Absence of state court review on this ground is now held to cut off review in federal habeas corpus proceedings. But in the two preceding cases where the State Supreme Court did review the evidence, this Court has also reviewed it. I find it difficult to agree with the soundness of a philosophy which prompts this Court to grant a second review where the state has granted one but to deny any review at all where the state has granted none.

The following facts indicate the obviousness of discriminatory Negro exclusion from jury service in Pitt County where this case was tried.

Negroes constituted about 47% of the population of the county and about one-third of the taxpayers. But the jury box of 10,000 names included at most 185 Negroes. And up to and including the Daniels' trial no Negro had ever served on a grand jury in modern times. Petitioners made objection in ample time to juries so discriminatorily chosen.

The Court's conclusion not to consider and act on this manifest racial discrimination rests on these facts: After petitioners' death sentence they were granted an appeal *in forma pauperis* to the State Supreme Court. June *6th* the trial judge granted *60* days for their lawyers to make up and serve their "statement of case on appeal." Preparation of this statement (comparable to a bill of excep-

tions) consumed valuable time because of difficulty in getting the stenographic transcript. On completion petitioners' counsel on Friday, August *5th,* called the prosecuting attorney's office to serve him but found he was out of town. According to the record he and his family were away for the weekend at a beach. They returned home Sunday, but he did not get back to his office until Monday, August *8th.* Had the statement been delivered at his office by a sheriff on Friday the *60th* day, apparently there would have been compliance with North Carolina law. Instead it was receipted for at his office on the *61st* day, two days before his return from the beach. In the State Supreme Court the Attorney General moved to dismiss on the ground that the notice was one day late. Although admittedly the court had discretionary authority to hear the appeal, it dismissed the case. Petitioners were thereby prevented from arguing the point of racial discrimination and consequently it has never been passed on by an appellate court. This denial of state appellate review plus the obvious racial discrimination thus left uncorrected should be enough to make one of those "extraordinary situations" which the Court says authorizes federal courts to protect the constitutional rights of state prisoners. Cf. *Frisbie* v. *Collins,* 342 U. S. 519, 520–521.

The Court thinks that to review this question and grant petitioners the protections guaranteed by the Constitution would "subvert the entire system of state criminal justice and destroy state energy in the detection and punishment of crime." I cannot agree. State systems are not so feeble. And the object of habeas corpus is to search records to prevent illegal imprisonments. To hold it unavailable under the circumstances here is to degrade it. I think *Moore* v. *Dempsey,* 261 U. S. 86, forbids this. In that case Negroes had been convicted and sentenced to death by an all-white jury selected under a practice of systematic exclusion of Negroes from juries. The State

Supreme Court had refused to consider this discrimination on the ground that the objection to it had come too late. This Court had denied certiorari. Later a federal district court summarily dismissed a petition for habeas corpus alleging the foregoing and other very serious acts of trial unfairness, all of which had been urged upon this Court in the prior certiorari petition. This Court nevertheless held that the District Court had committed error in refusing to examine the facts alleged. I read *Moore* v. *Dempsey, supra,* as standing for the principle that it is never too late for courts in habeas corpus proceedings to look straight through procedural screens in order to prevent forfeiture of life or liberty in flagrant defiance of the Constitution. Cf. *United States* v. *Kennedy,* 157 F. 2d 811, 813. Perhaps there is no more exalted judicial function. I am willing to agree that it should not be exercised in cases like these except under special circumstances or in extraordinary situations. But I cannot join in any opinion that attempts to confine the Great Writ within rigid formalistic boundaries.

Mr. Justice Frankfurter, whom Mr. Justice Black and Mr. Justice Douglas join, dissenting.

### Nos. 22 and 32.

The Court is holding today that a denial of certiorari in habeas corpus cases is without substantive. significance. The Court of Appeals sustained denials of applications for writs of habeas corpus chiefly because it treated our denial of a petition for certiorari from the original conviction in each of these cases as a review on the merits and a rejection of the constitutional claims asserted by these petitioners. In short, while the only significance of the denials of certiorari was a refusal to review, the Court of Appeals for all practical purposes, though disavowing the full technical import of *res judicata,* treated substantively empty denials as though this Court had

examined and approved the holdings of the Supreme Court of North Carolina that there was no purposeful discrimination against Negroes in the selection of juries in these cases.

This Court could have reached the constitutional claims in controversy had it seen fit to review the cases. It declined to do so, and that is all that the orders in 340 U. S. 835 and 341 U. S. 943 signify. Accordingly, the proceedings were left precisely as though the petitions for certiorari had not been filed here and habeas corpus had been brought initially in the District Court, as in *Frisbie* v. *Collins,* 342 U. S. 519. If that had been the case, could it be held that the District Court was foreclosed from going into the merits and was barred from determining whether these cases came within our decisions finding systematic discrimination against Negroes in five North Carolina trials? *Brunson* v. *North Carolina,* 333 U. S. 851.

Suppose that the District Court in these circumstances had found against *Brown* and *Speller.* What basis is there for assuming that on appeal the Court of Appeals for the Fourth Circuit, with its specialized local knowledge about such matters, would not have decided in favor of the petitioners? And what basis in reason have we for assuming, if the cases had come here with a powerful opinion from Judge Parker, let us say, finding that there was systematic discrimination, that this Court would have deemed it appropriate to review so weighty a conclusion, or, if we had taken the case, that we would have found the facts and their meaning to be different from those which the Court of Appeals for the Fourth Circuit found? Such assumptions are unwarranted, especially in light of the impressive showing by MR. JUSTICE BLACK that in fact there was unconstitutional discrimination in the make-up of the juries in these two cases where life is at stake.

I cannot protest too strongly against affirming a decision of the Court of Appeals patently based on the ground that that court was foreclosed on procedural grounds from considering the merits of constitutional claims, when we now decide that the court was wrong in believing that it was so foreclosed. The affirmance by this Court of the District Court's denial of writs of habeas corpus in these cases is all the more vulnerable in that this Court, without guidance from the Court of Appeals, proceeds to consider the merits of the constitutional claim. This Court concludes that there was not a systematic discrimination in keeping Negroes off juries. If this Court deemed it necessary to consider the merits, the merits should equally have been open to the Court of Appeals. As I have already indicated, that court is far better situated than we are to assess the circumstances of jury selection in North Carolina and to draw the appropriate inferences.

## No. 20.

In this case the Court of Appeals for the Fourth Circuit also sustained the District Court in dismissing applications for writs of habeas corpus based on the claim by the two petitioners here that their convictions for murder in the North Carolina court were vitiated by disregard of rights guaranteed by the United States Constitution. But this case is unlike the *Brown* and *Speller* cases; here the Court of Appeals did not find itself foreclosed to consider the merits by deeming itself bound by an adjudication of the merits in the Supreme Court of North Carolina followed by a denial of a petition for certiorari in this Court.[1] And the Court here does not sus-

---

[1] Although there was such a denial in this Court, no petition for certiorari was sought from the latest of the three decisions by the North Carolina Supreme Court prior to the initiation of the habeas

tain the District Court's dismissal by contending that the North Carolina Supreme Court had already adjudicated the merits, nor does this Court pass on the merits.

This Court sustains the lower courts on the ground that the right of review on the merits was foreclosed because the petitioners lost their right of review through failure to comply with the requirements of North Carolina law for perfecting an appeal in the Supreme Court of North Carolina. *State* v. *Daniels,* 231 N. C. 17, 341, 56 S. E. 2d 2, 646; *id.,* 232 N. C. 196, 59 S. E. 2d 430.

We were given to understand on the argument that if petitioners' lawyer had mailed his "statement of case on appeal" on the 60th day and the prosecutor's office had received it on the 61st day the law of North Carolina would clearly have been complied with, but because he delivered it by hand on the 61st day all opportunities for appeal, both in the North Carolina courts and in the federal courts, are cut off although the North Carolina courts had discretion to hear this appeal. For me it is important to emphasize the fact that North Carolina does not have a fixed period for taking an appeal. The decisive question is whether a refusal to exercise a discretion which the Legislature of North Carolina has vested in its judges is an act so arbitrary and so cruel in its operation, considering that life is at stake, that in the circum-

---

corpus proceedings now under review. It is not inappropriate to say that the certiorari that was denied here affords a good illustration of the reason for holding that no legal significance attaches to such a denial. It would be beyond the wit of the wisest panel of judges to determine on what ground, for what reason, the petition was denied. The papers in the case do not afford a rational foundation for saying that it was this ground rather than that. The conflicting bases for rejection not only may well have influenced different members of the Court; it is not at all unlikely that individual members of the Court did not feel it necessary to determine which of two grounds was decisive.

stances of this case it constitutes a denial of due process in its rudimentary procedural aspect.

For here we are not dealing with a frivolous or even a tenuous claim of a denial of rights guaranteed under the United States Constitution in the proceedings that led to a death sentence. It suffices to quote what was said in dissent by Circuit Judge Soper, one of the most experienced and hardheaded of federal judges:

> "There is no attempt on the part of the State of North Carolina in the pending appeal to show that there was not a gross violation of the constitutional rights of the prisoners in the trial court." *Daniels* v. *Allen,* 192 F. 2d 763, 770, 771.

And this statement was not questioned by the Court of Appeals.

The basic reason for closing both the federal and State courts to the petitioners on such serious claims and under these circumstances is the jejune abstraction that habeas corpus cannot be used for an appeal. Judge Soper dealt with the deceptiveness of this formula by quoting what Judge Learned Hand had found to be the truth in regard to this generality thirty years ago:

> "We shall not discuss at length the occasions which will justify resort to the writ, where the objection has been open on appeal. After a somewhat extensive review of the authorities twenty-four years ago, I concluded that the law was in great confusion; and the decisions since then have scarcely tended to sharpen the lines. We can find no more definite rule than that the writ is available, not only to determine points of jurisdiction, stricti juris, and constitutional questions; but whenever else resort to it is necessary to prevent a complete miscarriage of justice." *Kulick* v. *Kennedy,* 157 F. 2d 811, 813.

The reasons for finding that we have here so complete a miscarriage of justice are so powerfully stated by Judge Soper that I cannot do better than to adopt them as my own:

"The [trial] court's strict application of the procedural rules in a capital case in these two instances [of rulings by that court preventing defendants' attorneys from raising the jury question] can hardly be approved as a proper exercise of judicial discretion. The defendants merely asked for rulings which would have enabled them to obtain a review by the highest court of the state of the trial court's action on a grave constitutional question; and the relief could have been granted without interfering with the enforcement of the criminal laws of the state. It can hardly be doubted that the decision in each case lay within the discretion of the judge, but once it was taken, the Supreme Court of the state deemed itself powerless to interfere. Thus there is presented an impasse which can be surmounted only by a proceeding like that before this court. We have been told time and again that legalistic requirements should be disregarded in examining applications for the writ of habeas corpus and the rules have been relaxed in cases when the trial court has acted under duress or perjured testimony has been knowingly used by the prosecution, or a plea of guilty has been obtained by trick, or the defendant has been inadequately represented by counsel.[2]   Hawk v. Olson, 326 U. S. 271 . . .;

---

[2] This language is of course not to be read to mean that constitutional rights may not be freely waived. Under appropriate circumstances, conscious failure to appeal may constitute such waiver; the very question here is whether there has been a failure to appeal.

560

Darr v. Bu[r]ford, 339 U. S. 200, 203 . . . . It is difficult to see any material distinction in practical effect between these circumstances and the plight of the prisoners in the pending case who have been caught in the technicalities of local procedure and in consequence have been denied their constitutional right." 192 F. 2d, at 773.